[No. G031864. Fourth Dist., Div. Three. Jan. 11, 2005.]

INLINE, INC., et al., Plaintiffs and Appellants, v.
APACE MOVING SYSTEMS, INC., et al., Defendants and Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II.A.

COUNSEL

Law Offices of Steven J. Eichberg, Steven J. Eichberg and Steven G. Cohn for Plaintiffs and Appellants.

Friedenthal, Cox & Herskovitz, Daniel R. Friedenthal, Scott A. Cox, Mark H. Herskovitz, Janette S. Bodenstein and H. Douglas Galt for Defendant and Respondent Shurgard Storage Centers, Inc.

Stone, Rosenblatt & Cha, Gregg S. Garfinkel and Laurence F. Dunn III for Defendants and Respondents Apace Moving Systems, Inc., Jack G. Hays and Jenkins Auctioneers, Inc.

Bill Lockyer, Attorney General, Herschel T. Elkins, Assistant Attorney General, Ronald A. Reiter and David A. Zonana, Deputy Attorneys General, as Amici Curiae.

OPINION

**ARONSON, J.**— ■ Inline, Inc. and RGB Systems, Inc. (collectively Inline) appeal the trial court's grant of summary judgment determining as a matter of law that Shurgard Storage Centers, Inc. (Shurgard), a self-storage facility, conducted a lien auction of stored goods in a commercially reasonable manner. Inline also challenges the court's $20 ceiling on restitution against Apace Moving Systems, Inc. (Apace) for a warehouseman's lien auction deemed commercially unreasonable after a bench trial. We affirm both aspects of the judgment. Specifically, in the published portion of this opinion, we conclude the restitution remedy authorized by the unfair competition law (UCL) in Business and Professions Code section 17203 (all further statutory references are to this code unless otherwise specified) does not include: (a) the reimbursement of money expended by a plaintiff to recover property from a third party, or (b) recovery of the fair market value of property wrongfully disposed of by the defendant.

I

FACTUAL AND PROCEDURAL BACKGROUND

This case arises from a series of litigation battles between Inline and Jack Gershfeld. According to Inline, Gershfeld concealed valuable assets through various legal entities to avoid paying judgments owed to Inline. Those assets included several hundred thousands of dollars worth of electronic equipment, office furnishings, and computer/video interface products and parts. One of the entities Gershfeld used to hide assets was Production Resources, Inc.

(PRI), incorporated by his brother. Inline sought to attach PRI's assets, but they were not the only litigants seeking this prey.

## A. *Apace Warehouse Lease and Auction*

In May 1994, Future Electronics Corp. (Future), a company unrelated to Inline, obtained a default judgment against PRI in the amount of $62,688.22. Subsequently, Future sought a writ of attachment to levy upon one of PRI's bank accounts. The Orange County Marshal's Office (the Marshal) was unable to locate the account, so Future amended its Notice of Levy to include assets located at one of PRI's shuttered business addresses. The Marshal contacted Apace to pick up and store the property.

Apace stored the goods at its warehouse in Orange. On November 1, 1994, the Marshal gave notice of its intent to sell the seized property to satisfy Future's judgment. Approximately two weeks later, having failed to sell PRI's property, the Marshal terminated its possessory rights to the seized goods, paid Apace in full for all outstanding charges due as of November 30, 1994, and relinquished control of PRI's property.

On December 2, 1994, Apace demanded that PRI pay rent for its goods or retrieve them. PRI did not respond. Around March or April 1995, Apace sent notice to PRI and other "interested parties"[1] of its intent to sell the property at auction to satisfy its lien for storage charges. The original sale scheduled for May 6, 1995, was canceled due to inadequate turnout. The sale was rescheduled and conducted on October 7, 1995. Apace again sent notice via certified mail to all parties.

Apace enlisted defendants Jenkins Auctioneers, Inc. (Jenkins) and Jack G. Hays to assist in conducting the sale. Hays was in charge of placing a notice of sale in the newspaper based on Apace's description of the wares as either household or office equipment. Hays never received a property inventory and never saw the goods before the auction. He ran a Notice of Sale in the Orange County Reporter on September 22 and 29, 1995. The Notice of Sale read: "In accordance with the provisions of the California Uniform Commercial Code, there being due and unpaid storage for which the Apace Moving Systems, All Ways Moving & Storage and Starving Veterans Moving are entitled to a lien as Warehousemen on the goods hereinafter described and due notice having been given to parties known to claim an interest therein and the time specified in such notice for payment of such charges having expired, notice is hereby given that these goods will be sold at public auction at 230 West Blueridge, City of Orange, County of Orange, State of California, on the 7th day of October, 1995, at 9:30 o'clock A.M. The auction may

---

[1] These parties were PRI, the Marshal, and one "John Jeter, Attorney."

be rescheduled as needed, due to weather or time, by an announcement of the auctioneer. [¶] The following list is a brief description of the property to be sold: Household & Personal Goods and Business Equipment, as listed in the inventory sheets."

The "inventory sheets" did not provide any further description of the property. The auction was conducted on a loading dock at Apace's warehouse. The goods were contained in boxes stacked on wooden pallets; some of the top boxes were open, but most were sealed. Buyers sat in chairs in a parking area below the dock. Approximately 75–100 people attended the auction. The winning bid for the entire lot of PRI's goods was $20. Inline subsequently located the goods in the hands of a buyer who had acquired them from the winning bidder, and Inline purchased the lot for $100,000.

## B. *Shurgard Self-Storage Lease and Auction*

While the fate of its property stored with Apace was unfolding, on December 27, 1994, PRI entered into a self-storage lease agreement with Shurgard for storage of other property in Shurgard's La Habra facility. Mikhail Gershfeld, Jack Gershfeld's brother and PRI's sole shareholder, signed the lease.

In the lease, Mikhail Gershfeld put the value of the stored goods at $100,000. Paragraph 8 of the lease specified the property would be sold "in accordance with California law" if the rent or other charges due were not paid for 14 consecutive days. Paragraph 8 of the lease agreement also provided that before the sale, a notice describing the goods and identifying PRI as the owner would be advertised in a newspaper of general circulation, and that any person with a prior lien could claim the property by paying the total amount owed.

At some point, payments to Shurgard stopped. Shurgard sent PRI a past-due rent notice on July 11, 1995, a Preliminary Lien Notice on August 2, and on August 16 sent a Notice of Lien Sale. Shurgard sent an Auction Notice informing PRI of an October 25 auction date. Shurgard also ran an advertisement in the Orange County Register on October 13 and 20, 1995. The ad stated: "Public Notice of Sale [¶] Pursuant to Chapter 10, commencing with 21700 of the Business and Professions Code, notice is hereby given that Shurgard of La Habra will cause to be sold to the general public by competitive bid at 999 E. Lambert Rd., La Habra, CA 90631, on October 25, 1995 at 1:00 p.m. the following described property: [from Storage Unit] 315 [owned by] Production Resources: elect. components, caps, tubing, 8 boxes, strobes [¶] . . . [¶] Purchase must be made with cash only and at the time of sale, sale subject to cancellation in the event of settlement between landlord and obligated party."

Shurgard hired O'Brien's Auction Service to conduct the sale. There were approximately 10 to 15 bids made on the PRI lot, and the winning bid was $700. According to the winning bidder, based on his attendance at over 2,000 similar auctions, there was nothing unusual about this one.

## C. *Subsequent Proceedings*

Soon after the Apace auction on October 7, 1995, and the Shurgard auction on October 25, 1995, Inline acquired all of PRI's stock by credit bid at an auction held by the Los Angeles County Marshal on December 28, 1995. But PRI had filed for bankruptcy protection on November 29, 1995. On July 11, 1996, the bankruptcy court approved a settlement between Inline and PRI. The compromise specifically assigned to Inline any rights held by PRI or its trustee in bankruptcy against entities for acquisition or transfer of assets before the bankruptcy filing, and identified Apace and Shurgard by name.

Inline immediately filed suit against Apace, Shurgard, and the auctioneers. The complaint alleged multiple causes of action, including conversion and violation of the Uniform Fraudulent Transfer Act (Civ. Code, § 3439 et seq.) and the UCL (§ 17200 et seq.). Apace and Shurgard obtained summary adjudication of certain issues and later successfully demurred to an amended complaint filed by Inline, but the orders granting summary adjudication and sustaining the defendants' demurrers were reversed on appeal on procedural grounds.

On remand, Inline agreed to dismiss the conversion and fraudulent transfer causes of action. The case was thus narrowed to whether Apace's and Shurgard's auctions were "commercially reasonable" under statutory provisions governing Apace as a warehouse (Cal. U. Com. Code, § 7210) and Shurgard as a self-storage facility (Bus. & Prof. Code, § 21707) and, if not, the proper measure of restitution under the UCL for unlawful business practices. (§ 17203.) Defendants moved for summary judgment. The trial court granted Shurgard's summary judgment motion, denied Apace's, and, after a brief bench trial, awarded Inline $20 in restitution—the amount Apace received at auction for Inline's goods. Inline now appeals.

II

DISCUSSION

A. *Shurgard's Summary Judgment Motion**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

B.  *Remedy for Apace's Commercially Unreasonable Auction*

The trial court, as the trier-of-fact, found Apace's auction of PRI's goods was commercially unreasonable under provisions of the Commercial Code applicable to warehouse facilities. (See Cal. U. Com. Code, § 7210.) Inline contends the court erred in limiting restitution under the UCL to the $20 Apace received at auction. Specifically, Inline argues the restitution remedy authorized by section 17203 is broad enough to require Apace to reimburse Inline the $100,000 purchase price it paid a third party who had procured the goods from the auction's winning bidder. The Attorney General, as amicus curiae,[2] supports Inline's contention the trial court erred in limiting recoupment to $20, but takes no position on the $100,000 figure, arguing the restitution award should be set at the fair market value of the goods, whatever that might be. In essence, then, the issue for our determination is whether section 17203's restitution remedy includes: (a) the reimbursement of money expended by a plaintiff to recover property from a third party, or (b) recovery of the fair market value of property wrongfully disposed of by the defendant. Applying the plain terms of section 17203 and Supreme Court precedent, we conclude restitution under the UCL does not include these theories of relief.

■ A UCL action " ' "borrows" violations of other laws and treats these violations, when committed pursuant to business activity, as unlawful practices independently actionable under section 17200 et seq. and subject to the distinct remedies provided thereunder.' " (*Farmers Ins. Exchange v. Superior Court* (1992) 2 Cal.4th 377, 383 [6 Cal.Rptr.2d 487, 826 P.2d 730].) "Civil penalties may be assessed in *public* unfair competition actions, but the law contains no criminal provisions." (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1144 [131 Cal.Rptr.2d 29, 63 P.3d 937] (*Korea Supply*), citing § 17206, italics added.) Section 17203 specifies the remedies available in private UCL actions: "Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. *The court may make such orders or judgments,*

---

*See footnote, *ante*, page 895.

[2] Section 17209 requires that notice of trial and appellate proceedings involving the UCL be served on the Attorney General, and California Rules of Court, rule 13(c)(6), provides broad authority for the Attorney General to file amicus briefs in such matters.

including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or *as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition."* (Italics added.)

■ The plain terms of section 17203 do not encompass the repossession damages Inline seeks. "The fundamental objective of statutory construction is to ascertain the Legislature's intent and to give effect to the purpose of the statute. (Code Civ. Proc., § 1859.)" (*Korea Supply, supra,* 29 Cal.4th at p. 1146.) "If the language of the statute is unambiguous, the plain meaning governs." (*Ibid.*) ■ As observed by our Supreme Court, pursuant to the express language of section 17203, "[p]revailing plaintiffs are generally limited to injunctive relief and restitution." (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 179 [83 Cal.Rptr.2d 548, 973 P.2d 527], see *Korea Supply, supra,* 29 Cal.4th at p. 1144 [noting that, "[w]hile the scope of conduct covered by the [UCL] is broad, its remedies are limited"].) Because the statute makes no provision for damages, "damages are not available under section 17203." (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1266 [10 Cal.Rptr.2d 538, 833 P.2d 545] (*Bank of the West*).)

■ The distinction between damages and restitution can seem elusive (see *People v. Beaumont Inv., Ltd.* (2003) 111 Cal.App.4th 102, 134 [3 Cal.Rptr.3d 429]), but our Supreme Court has drawn a clear line between the two concepts in the context of section 17203 and the UCL. On one hand, " '[d]amages' describes a payment made to compensate a party for injuries suffered." (*Jaffe v. Cranford Ins. Co.* (1985) 168 Cal.App.3d 930, 935 [214 Cal.Rptr. 567] (*Jaffe*).) In contrast, a monetary payment "is more properly characterized as restitutionary . . . than compensatory in nature" when "[t]he defendant is asked to return something he wrongfully received; he is not asked to compensate the plaintiff for injury suffered as a result of his conduct." (*Ibid.*) The court has further specified that "[t]he only nonpunitive monetary relief available under the Unfair Business Practices Act is the disgorgement of money that has been wrongfully obtained or, in the language of the statute, an order 'restor[ing] . . . money . . . which may have been acquired by means of . . . unfair competition.' " (*Bank of the West, supra,* 2 Cal.4th at p. 1266.)

The problem for Inline—and the position taken by the Attorney General—is that the " 'money that has been wrongfully obtained' " (*Bank of the West, supra*, 2 Cal.4th at p. 1266) or, in the language of the statute, "acquired by means of . . . unfair competition" (§ 17203), is the $20 received by Apace from the winning bidder at the auction. There is no evidence the $100,000 Inline paid to a third party was "acquired by means of such unfair competition." To the contrary, the record discloses that Inline purchased its property post-auction in an arm's-length business transaction.

Inline contends it was "compelled" to make the purchase to prevent the goods—stamped by Gershfeld with the "Inline" brand but untested, outdated, and inferior in quality—from entering the marketplace. Notably, however, Inline dropped its cause of action for conspiracy against all involved in the auction and does not contend the third party it paid $100,000 must disgorge any monies. In sum, nothing suggests this reseller committed any act of unfair competition requiring disgorgement of the $100,000 received from Inline.

█ Of course, Inline seeks reimbursement not from the third party, but from Apace, arguing it only paid the $100,000 as a consequence of Apace's commercially unreasonable auction. But consequential damages are outside the restitutionary scope of section 17203. (See *Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 174 [96 Cal.Rptr.2d 518, 999 P.2d 706] (*Cortez*) [a tort award of monetary compensation for lost wages, pain and suffering, physical injury, and property damage "would not include an element of restitution"].) In requesting more than the $20 received at auction, Inline asks Apace not just "to return something [it] wrongfully received" (*Jaffe, supra*, 168 Cal.App.3d at p. 935 [defining restitution under the UCL]), but "to compensate the plaintiff for injury suffered as a result of [defendant's] conduct." (*Ibid.*) In other words, Inline asks for damages. (See *ibid.*) █ But damages are not available under section 17203. (*Bank of the West, supra*, 2 Cal.4th at p. 1266.)

█ We emphasize our Supreme Court's admonishment that section 17203 is not "an all-purpose substitute for a tort or contract action." (*Cortez, supra*, 23 Cal.4th at p. 173.) Inline and RGB argue they are entitled to "substitutionary restitution" because " 'specific restitution' of Plaintiffs' property is impossible." █ But this turns the nature of restitution under the UCL on its head. (See *AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 835 [274 Cal.Rptr. 820, 799 P.2d 1253] (*AIU Ins Co.*) [restitutive remedies are " 'specific' rather than 'substitutive' in character"].) The relief Inline seeks is

embodied in Civil Code section 3336, which identifies "fair compensation for the time and money properly expended in pursuit of the property" as a remedy for the tort of conversion. (Cf. Cal. U. Com. Code, § 7210, subd. (9), italics added ["The warehouseman is liable for *damages* caused by failure to comply with the requirements for sale under this section"]; accord, *Shimamoto v. S & F Warehouses, Inc.* (N.Y. 2002) 99 N.Y.2d 165 [753 N.Y.S.2d 419, 423, 783 N.E.2d 484] italics added ["actual *damages* flowing from a violation that is less than willful have been defined as the difference between the amount actually made from the sale of goods and the amount that would have been realized had the sale been commercially reasonable"].) In contrast, as discussed, section 17203 is an equitable remedy designed to afford specific relief by requiring disgorgement of the particular property or money taken by an unfair business practice, rather than damages compensation. (See *AIU Ins. Co., supra,* 51 Cal.3d at p. 835 [recognizing that restitutive remedies return to a plaintiff " ' "the very thing to which he was entitled," ' " while damages substitute money as compensation for a loss].) In sum, the trial court properly concluded it could not award monetary relief under the UCL beyond the restitutionary scope of section 17203.

Finally, the Attorney General's attempt to introduce potentially complex fair market value assessments into UCL actions bolsters our conclusion. As reiterated by the Supreme Court: " 'The exclusion of claims for compensatory damages is also consistent with the overarching legislative concern to provide a *streamlined* procedure for the prevention of ongoing or threatened acts of unfair competition. To permit individual claims for compensatory damages to be pursued as part of such a procedure would tend to thwart this objective by requiring the court to deal with a variety of damage issues of a higher order of complexity.' " (*Cortez, supra,* 23 Cal.4th at pp. 173–174, quoting *Dean Witter Reynolds, Inc. v. Superior Court* (1989) 211 Cal.App.3d 758, 774 [259 Cal.Rptr. 789].) Put simply, requiring trial courts to evaluate and calibrate a plaintiff's retrieval costs to fair market value or some other index would take the court into forays beyond simply restoring money or property pursuant to section 17203. (See *Day v. AT&T Corp.* (1998) 63 Cal.App.4th 325, 339 [74 Cal.Rptr.2d 55] [noting that in § 17203 cases, "the amount being restored has been objectively measurable as that amount which the defendant would not have received but for the unfairly competitive practice"].) Here, the objectively measurable amount Apace received through its auction was $20. There are no grounds to reverse the trial court's judgment limiting restitution to that amount.

## III

## DISPOSITION

The judgment is affirmed. Respondents are entitled to their costs on appeal. (Cal. Rules of Court, rule 27.)

O'Leary, Acting P. J., and Fybel, J., concurred.

Appellants' petition for review by the Supreme Court was denied April 20, 2005. George, C. J., did not participate therein.