171 Cal.App.4th 1399 (2009)
HARVEY GRODENSKY, Plaintiff and Respondent,
v.
ARTICHOKE JOE'S CASINO et al., Defendants and Appellants.
HARVEY GRODENSKY, Plaintiff and Appellant,
v.
ARTICHOKE JOE'S CASINO et al., Defendants and Respondents.
No. A119035, A119036.
Court of Appeals of California, First District, Division Two.
March 11, 2009.
*1409 Spiro Moss Barness, Dennis F. Moss; Law Offices of Andrew Kopel and Andrew R. Kopel for Plaintiff and Appellant and for Plaintiff and Respondent.
Kauff McClain & McGuire, Maureen E. McClain and Robert D. Links for Defendants and Appellants and for Defendants and Respondents.

OPINION
LAMBDEN, J.โ
Artichoke Joe's Casino (Artichoke Joe's or the casino) implemented a mandatory tip pooling policy for the dealers. A dealer, Harvey Grodensky, filed a class action and alleged claims for conversion and violating Labor Code sections 351 and 1194. He also claimed in his representative capacity that the casino had violated the unfair competition law (UCL). After a bench trial, the trial court found that a mandatory tip pool was legal. However, it determined the shift managers were agents of the casino and therefore the casino violated Labor Code section 351 by distributing a portion of the tip money to the shift managers. The court also found that this violation of the Labor Code supported Grodensky's UCL claim. The court ordered restitution for the amount of tip money given to the shift managers and issued an injunction. It also ruled that Grodensky was entitled to an award of attorney fees under Code of Civil Procedure section 1021.5. Both parties appealed and we, on our own motion, consolidated the appeals.
On appeal, Artichoke Joe's asserts that a protective order issued by the trial court was unlawful, that Labor Code section 351 did not provide Grodensky with a private right of action, and that restitution was not a proper remedy. It also challenges the court's award of attorney fees to Grodensky and the class. We agree that the lower court did not apply the proper test under Code of Civil Procedure section 1021.5 when determining that Grodensky was entitled to attorney fees and remand for the court to consider whether to award attorney fees using the proper test. We otherwise reject the casino's arguments.
In the appeal by Grodensky and the class, they argue that the trial court erred in finding that the mandatory tipping pool did not violate Labor Code section 351 and that the casino did not violate Labor Code section 1194. They also object to the lower court's rulings that the floor managers were not agents under Labor Code section 350, subdivision (d), that Grodensky could not bring a claim of conversion, and that Grodensky and the class did not have a UCL claim based on alleged violations of Labor Code sections 221 and 450. We are not persuaded by any of Grodensky and the class's arguments.

*1410 BACKGROUND

Pretrial

The Complaint, Protective Order, and Class Certification
On July 12, 2002, Grodensky, a dealer at the casino, filed a class action lawsuit against the casino and Dennis J. Sammut challenging the implementation of a tip pool, which required the dealers to contribute to a tip pool.[1] Sammut's father started Artichoke Joe's as a family business in 1957. The casino became a corporate operation in approximately 1986; Sammut is one of the three major shareholders and an officer of the corporation.
In his complaint, Grodensky set forth claims of conversion and violations of the gratuity statute (Lab. Code, ง 351), the minimum hourly wage laws (Lab. Code, ง 1194), and the UCL (Bus. & Prof. Code, ง 17200 et seq.). With regard to violating Labor Code section 351, Grodensky alleged that the dealers' tips were taken, collected, or received by the casino and illegally distributed to its agents.
On May 13, 2003, Grodensky filed a motion for class certification. The following day, the casino sent a memorandum to all cardroom dealers, which stated in relevant part: "On Tuesday, May 20, 2003, we have scheduled three meetings for all of the card room dealers. These meetings will be held to talk about a lawsuit that has been filed against Artichoke Joe's concerning wages and the tip pool. [ถ] The lawsuit has been filed as a potential class action involving all past and present card room dealers at Artichoke Joe's. That means the lawsuit could impact you as well as other employees at Artichoke Joe's. For that reason, we have asked our attorneys to meet with you as a group to talk about the matter. Our attorneys also will be available to meet with you individually.... [ถ] ... Your attendance at any one of these sessions will be on the clock."
The dealers were required to sign an acknowledgement that they had read the foregoing memorandum. The acknowledgement stated: "I have read the memo about the meetings for dealers scheduled for Tuesday, May 20, 2003. I understand Artichoke Joe's recommends that I attend, since the issues in question could affect me, but I am not required to attend."
Grodensky filed an application for a protective order, which the court heard on May 19, 2003. The court granted the protective order under the following terms and conditions: "1. The meetings unilaterally scheduled by defendants *1411 and defense counsel for May 20th with members of the putative class who are employee dealers shall not go forward and shall be immediately cancelled. [ถ] 2. There shall not be any communications regarding this lawsuit or the claims asserted therein between defendants and members of the putative class who are presently employed by any defendant, while determination of the class certification motion is pending, unless otherwise specifically ordered by this court subsequent to the entry of this order. [ถ] 3. There shall not be any communications regarding this lawsuit or the claims asserted therein between defendants' counsel and any members of the putative class, while determination of the class certification motion is pending, unless otherwise specifically ordered by this court subsequent to the entry of this order. [ถ] 4. If defendants or defense counsel believe they have a need to have communication with any class member regarding this lawsuit or the claims asserted therein for purposes of investigation, defendants shall make written application to the court for such communication and receive court approval prior to any such communication. . . ."
On August 4, 2003, the trial court granted in part Grodensky's motion to certify a class. Of the 137 known class members, 59 opted out of the class, including one former employee and 58 current employees. The class consisted of 43 former employees and 35 current employees for a total of 78 current and former dealers. Grodensky did not seek class certification for his UCL claim. Subsequently, the trial court dismissed with prejudice Grodensky's claim for conversion.

The Ruling on the Private Right of Action Issue
The parties stipulated that the trial court would adjudicate certain issues after considering the parties' briefing and argument. One such issue was whether Grodensky and the class had a private right of action for violating Labor Code section 351 regarding the taking of their tips by the employer for distribution to other employees. In its order filed on December 9, 2003, the court ruled that Grodensky and the class did have a private right of action under Labor Code section 351 against their employer. The casino again raised this issue in its summary judgment motion; the court again found that there was a private right of action.

The Bench Trial
The matter proceeded to a three-stage bench trial. In the first phase, the trial court addressed the claims for violating Labor Code sections 351 and 1194. The second phase concerned Grodensky's UCL claim. The final phase concentrated on remedies.

*1412 Evidence Presented

The casino is located in San Bruno and has been in business for decades. It operates 24 hours a day, seven days a week. Games played at the casino include poker games such as "Texas Hold `Em." Players do not play against the house, but play against each other. They are charged a fee by the casino to play the available games.
The players give tips directly to the dealer. The players stay at the table with the dealer and, if they keep winning, they repeatedly tip the dealer. Players separately tip board persons, floor managers, shift managers, and chip sellers.
In late 1993, the Internal Revenue Service (IRS) began an investigation into whether the cardroom employees at the casino were complying with various federal income tax reporting requirements.
According to Joe Willson, the general manager of the casino, the casino began considering the adoption of a tip pool after being contacted by the IRS. On August 22, 1997, the casino received a letter from the regional commissioner of the IRS stating that employees in the casino industry had not been properly reporting their tip income. It proposed a "Tip Rate Determination Agreement" (TRDA) with the casino, which would result in no further tip audits. The letter explained: "To participate in this program, you, the employer, must first establish a set of rates for the various categories of employees at your establishment. Rates must be based upon empirical data and must be verifiable. . . . All rates must be approved by the IRS before we enter into a TRDA agreement." The letter announced that the IRS had set January 1, 1998, as the date for implementing these agreements.
Prior to October 1998, the casino permitted the dealers to do whatever they wanted with their tips; tip sharing with other employees was voluntary and random. The dealers determined whether they wanted to give tips to others and how much those tips would be. In March 1998, the following writing reflected the policy of the casino: "It is Artichoke Joe's policy that every employee shall have sole discretion over all tips received by him or her. No employee is required to split tips, pool tips, or share tips with other employees in any other way, and no action may be taken against an employee who chooses to keep all of his or her tips. Any sharing of tips is at the sole discretion of the employee who received such tips . . . ."
The IRS approved a TRDA with the casino on May 6, 1998. The tip rate per hour was set forth in the agreement as follows: $1 for the board person, $2 for the chip sellers, $2.50 for the day shift cage workers, $3.50 for the *1413 swing or night shift cage workers, $9 for the poker floor manager, $15 for the poker dealers, $15 for the day shift manager, and $17 for the night shift manager. Willson reported that the IRS required participation by 75 percent of the employees in order to have the agreement enforced. The employees did not sign the TRDA but indicated consent to the terms of the TRDA by signing a "Tipped Employee Participation Agreement."
In June 1998, a competing casino opened in nearby Colma. The competition caused employee defections and a severe decrease in the casino's business. Landon Bachman, the cardroom manager, stated that the dealers began to complain that the established tipping rate was too high because it did not accurately account for the amount of money the dealers voluntarily "tipped-out."
Willson stated that the tip-outs were going mostly to the shift managers and not to the other employees. He reported that all of the employees at this time were suffering low morale and that the employees, especially the dealers, were not making a living. He agreed that the lower morale affected the service they were providing to the customers "[t]o a certain degree . . . ." Willson stated that he believed a tip pool would meet the IRS requirements, improve employee morale, and further customer service. Willson testified that he did not believe it was feasible to have a tip pool that excluded floor and shift managers because he would not have "any guys working there if that happened." Even if sharing tips with the dealers and shift managers was illegal, Willson responded that such a tip pool was best for his employees and his business.
The casino instituted a mandatory tip pool effective October 26, 1998. The casino began to renegotiate the 1998 TRDA to lower the established tip rate. On July 8, 1999, the TRDA was formally amended to include both the tip pool and the corresponding lower established tip rate for dealers. Dealers were to pay a set hourly amount into the tip pool of $3 or $5 per hour, depending upon their shift, regardless of the amount of tips actually received. No other employees were required to share their tips with any other employees. The required tip pool was then divided among shift managers, floor managers, board persons, and chip sellers. The payments to shift managers and others were pursuant to a point system: shift managers received six points per eight-hour shift, floor managers obtained four points per shift, and others earned one or two points per shift. Each point was worth approximately $15 to $17.
Shift managers collected the dealers' contributions to the tip pool. They placed these funds in a non-interest-bearing general account of the casino. Melanie Maraffio, the casino's controller, stated that the casino never used *1414 any of the money from the tip pool for anything other than tip pool checks to the recipients. She declared that the casino staff spent about four to five hours a week implementing the tip pool.

The Trial Court's Rulings and the Parties' Stipulations

Labor Code Violations
On June 9, 2005, following the court trial on the first two causes of action for violating Labor Code sections 1194 and 351, Judge Marie Weiner issued her final statement of decision. She found that the casino had not violated the minimum wage laws under Labor Code section 1194.
With regard to the alleged violation of Labor Code section 351, the court noted that there was little or no case law interpreting this statute. The court stated that the parties had stipulated that board persons and chip sellers were not agents under this statute and thus the only issue was whether a floor manager or a shift manager was an agent as defined by the statute. The court observed that it was undisputed that both floor managers and shift managers did not have authority to hire or fire any employee. It was also undisputed that only Bachman, the cardroom manager, scheduled the dealers' shift assignments, approved vacation leave, set starting times, and approved medical leave for dealers. Shift managers and floor managers had no role in the setting of wages, benefits, or work hours of employees. Thus, the court explained that the only issue in dispute was whether floor managers or shift managers supervised, directed, or controlled the acts of the dealers.
The trial court found that the floor manager's principal responsibility was to resolve disputes between customers or between dealers and customers. The casino did publish and disseminate to its employees a manual that identified floor managers as the supervisors of dealers and the shift managers as the supervisors of floor managers, but the court noted this was not dispositive of the issue. The court determined that "[i]n its essence, the duties of the floor manager are to start games, greet customers, see that games run smoothly, change cards for games, prevent cheating, mak[e] rulings on misdeals or disputes, and protect dealers from abuse of patrons (by getting rid of troublemakers)." It therefore concluded that Grodensky and the certified class did not show by a preponderance of the evidence that the floor managers were agents under Labor Code section 350, subdivision (d). It concluded that the casino did not violate Labor Code section 351 by having a mandatory tip pool that required dealers to share their tips with floor managers.
*1415 With regard to shift managers, the casino had six shift managers and one of them worked each shift. Shift managers were responsible for ensuring that the floor managers were doing their jobs correctly. The court pointed out that it also heard evidence that, for each shift, the shift managers assigned the floor managers to the sections they were to work and assigned the dealers to particular tables. Additionally, the court assessed evidence that shift managers had the authority to discipline employees by sending them home. When Bachman or Willson was absent from the premises, the shift manager had authority over the entire casino. The court concluded that Grodensky and the certified class proved by a preponderance of the evidence that shift managers were agents under Labor Code section 350, subdivision (d), and thus the casino had violated Labor Code section 351 by requiring the dealers to share their tips with shift managers.
The court rejected Grodensky's claim that a mandatory tip pooling policy violated Labor Code section 351. It also found that the IRS treaty did not vitiate the casino's obligation to follow California's labor laws.
The trial court found that Sammut was not an employer under Labor Code section 350, subdivision (a), and was therefore not personally liable for any violation of Labor Code section 351. The undisputed testimony was that Sammut was involved full time in the legislative and lobbying efforts of Artichoke Joe's corporate parent and that he was not involved in drafting and implementing the policies and procedures of the casino's cardroom. Finally, the court denied the casino's motion for decertification of the class.

The UCL
On May 5, 2006, the trial court filed its final statement of decision regarding liability for violating the UCL. The court reiterated that it had found that the casino had violated Labor Code section 351 by requiring dealers to share their gratuities with shift managers. The court found that noncompliance with Labor Code section 351 supported the UCL claim, but it rejected the assertion that the mandatory tip pool program also violated Labor Code sections 221 and 450. The court rejected Grodensky's arguments that Artichoke Joe's engaged in an unfair or deceptive business act or practice. It again found that Sammut was not individually liable for any violation of the UCL.

Stipulations
On August 16, 2006, the parties filed their stipulations. They agreed that if the court provided relief under the UCL, such relief would be applicable to the entire existing class of 78 individuals, but to no one else. The total *1416 amount of tips transferred pursuant to the mandatory tip pool policy was $4,283,553. Approximately 16.99 percent of this total was transferred to shift managers. The parties agreed that the total amount of money collected from the 78 existing class members and distributed to shift managers was $344,761.93.

The Remedies
On April 16, 2007, the trial court filed its statement of decision on damages, restitution, and other relief. The court awarded the certified class compensatory damages of $344,761.93 plus prejudgment interest against the casino. The court permanently enjoined the casino from having a mandatory tip pool whereby dealers had to share their gratuities with shift managers.
The court concluded that attorney fees were warranted under Code of Civil Procedure section 1021.5, since it found that "[t]he costs of prosecuting this case transcended the personal interest and personal stake of the plaintiff and of each member of the certified class." The court noted that this lawsuit was risky and involved "the dilemma of plaintiff and other class members suing their employer." The court found that a significant public benefit was obtained for all cardroom dealers as "it freed them from the restrictions of a mandatory tip sharing with shift managers." It also determined that the lawsuit resulted in the enforcement of an important right under the Labor Code affecting the public interest. The court stated that it would award the certified class attorney fees in an amount to be determined.[2]

Judgment, Entry of Judgment, and the Appeals
The trial court filed its judgment on June 21, 2007. After the court issued its decisions regarding Grodensky's first three causes of action, the court noted that the parties stipulated that the damages in the case were $344,761.93. The court ordered the casino to pay this amount plus prejudgment interest of $137,715.01.
Judgment was entered on July 19, 2007. Notice of entry of judgment was filed on July 19, 2007. Both the casino and Grodensky separately filed timely notices of appeal. This court on its own motion consolidated the appeals.

*1417 DISCUSSION

I. The Casino's Appeal

A. Protective Order

After the casino had scheduled meetings for its counsel to discuss Grodensky's class action with the dealers, the trial court issued a protective order. The court cancelled the meetings scheduled between the casino's counsel and the dealers. It also prohibited any communications regarding the lawsuit between the casino and dealers while determination of the class certification motion was pending. On appeal, Artichoke Joe's contends that the lower court abused its discretion in issuing this protective order and asserts this ruling "tainted" the resulting class certification order.
(1) If, as in the present case, a party moves for a protective order, the trial court may impose restrictions on such communications only "`by a showing of direct, immediate and irreparable harm.'" (Parris v. Superior Court (2003) 109 Cal.App.4th 285, 299 [135 Cal.Rptr.2d 90].) "Broad-based assertions that a proposed informational notice is `unfair,' contains some inaccurate statements, or is presented in a misleading form are simply insufficient bases for imposition of judicial limitations on protected speech in the form of a prior restraint. Even then, any restrictions `"must be narrowly drawn and cannot be upheld if reasonable alternatives are available having a lesser impact"' on the right to free speech. [Citation.] Finally, `the restraint "must have been accomplished with procedural safeguards that reduce the danger of suppressing constitutionally protected speech." [Citation.]' [Citation.]" (Id. at p. 300, fn. omitted.)
We, however, do not need to reach the merits of the lower court's ruling on the protective order because the casino has failed to establish prejudice. Artichoke Joe's challenge to the issuing of a protective order comes after the trial has concluded and a judgment has been entered. Thus Artichoke Joe's has the burden of showing that the ruling on the protective order resulted in a miscarriage of justice (County of Los Angeles v. Nobel Ins. Co. (2000) 84 Cal.App.4th 939, 945 [101 Cal.Rptr.2d 320]).
Our state Constitution provides that "[n]o judgment shall be set aside, or new trial granted, in any cause, . . . for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, ง 13.) We examine *1418 "`each individual case to determine whether prejudice actually occurred in light of the entire record.'" (Cassim v. Allstate Ins. Co. (2004) 33 Cal.4th 780, 801-802 [16 Cal.Rptr.3d 374, 94 P.3d 513].) "No form of civil trial error justifies reversal and retrial, with its attendant expense and possible loss of witnesses, where in light of the entire record, there was no actual prejudice to the appealing party." (Soule v. General Motors Corp. (1994) 8 Cal.4th 548, 580 [34 Cal.Rptr.2d 607, 882 P.2d 298].) Reversal is only required "`where it seems probable' that the error `prejudicially affected the verdict.'" (Ibid.)
In arguing that a miscarriage of justice has occurred, the casino asserts the following: "[O]ne cannot know the impact of the disputed order until [the judgment] is reversed and Artichoke Joe's is accorded its constitutional right to communicate with the putative class. One can assume with reasonable probability that, had the company been allowed to impartially discuss the implications of this proceeding early on with putative class members, even more of them would have declined to join Grodensky's lawsuit. As it was, with Artichoke Joe's bound by the trial court's unconstitutional straightjacket, only 77 of the possible 137 possible class members wanted anything to do with Grodensky's case."[3] The casino concludes that "the clear indication is that even more putative class members would have opted out, perhaps so many that there would have been no `numerosity' to justify a class action in the first place."
The casino's conclusory and speculative comments do not establish prejudice. Artichoke Joe's has merely surmised that the result could have been different had the trial court not issued the protective order. It has not demonstrated what communications it could have had with the class members that would have resulted in class members opting out. In fact, the record indicates that the most significant factor related to opting out of the class was not what a person was told; rather, the most significant factor was whether the person was currently employed by Artichoke Joe's. Thus, of the 59 people opting out, only one was a former employee. Of the 78 class members, 43 were former employees and there is no evidence suggesting that these people would have opted out had the court not restricted the casino's communications with them during the precertification period. When denying one of the casino's motions to decertify the class, the lower court noted that the most common explanation for opting out was that the current employees were not comfortable suing their employer "regardless of the merits of the case." Opting out therefore appeared to be related to the person's current employment status, not to what Artichoke Joe's did or did not say to the putative class members.
*1419 Accordingly, we conclude that Artichoke Joe's has failed to demonstrate on this record that the trial court's issuing of a protective order, even if erroneous, led to a miscarriage of justice.

B. Private Right of Action Under Labor Code Section 351

The casino contends that the lower court erred in finding that Grodensky and the class had a private right of action under Labor Code section 351. In arriving at its ruling, the trial court considered the language and legislative history of Labor Code section 351 as set forth in Henning v. Industrial Welfare Com. (1988) 46 Cal.3d 1262 [252 Cal.Rptr. 278, 762 P.2d 442] (Henning) and concluded that the Legislature intended to give employees a private right of action to claim their tips from their employers. The trial court cited the reasoning and holdings in People v. Los Angeles Palm, Inc. (1981) 121 Cal.App.3d 25, 35 [175 Cal.Rptr. 257] and Jameson v. Five Feet Restaurant, Inc. (2003) 107 Cal.App.4th 138, 141 [131 Cal.Rptr.2d 771], as underscoring the fact that the Legislature intended the gratuities to be the property of the employee. The trial court concluded, "It would seem logical that a person can bring a civil lawsuit to protect against infringement of his/her own property."
While this case was pending in front of us, this issue was addressed by the Second District in Lu v. Hawaiian Gardens, Inc. (2009) 170 Cal.App.4th 466 [88 Cal.Rptr.3d 345] (Lu). The Lu court held that Labor Code section 351 (and Lab. Code, ง 45) did not create a private right of action. For the reasons set forth below, we disagree with the Lu court and hold that Labor Code section 351 provides a private right of action for employees to recover their tips unlawfully collected by an employer.

1. Standard of Review

Artichoke Joe's argues that the lower court erred in interpreting Labor Code section 351 as providing a private right of action. Whether Grodensky may maintain a private right of action under the statute is a question of law. (Vikco Ins. Services, Inc. v. Ohio Indemnity Co. (1999) 70 Cal.App.4th 55, 67 [82 Cal.Rptr.2d 442].) We review questions of law de novo. (Ghirardo v. Antonioli (1994) 8 Cal.4th 791, 799 [35 Cal.Rptr.2d 418, 883 P.2d 960].)
(2) "In statutory construction cases, our fundamental task is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute." (Estate of Griswold (2001) 25 Cal.4th 904, 910 [108 Cal.Rptr.2d 165, 24 P.3d 1191].) "`We begin by examining the statutory language, giving the words their usual and ordinary meaning.'" (Id. at p. 911.) "If the terms of the *1420 statute are unambiguous, we presume the lawmakers meant what they said, and the plain meaning of the language governs." (Ibid.)
"`Additionally, however, we must consider the [statutory language] in the context of the entire statute [citation] and the statutory scheme of which it is a part.'" (Phelps v. Stostad (1997) 16 Cal.4th 23, 32 [65 Cal.Rptr.2d 360, 939 P.2d 760].) "`"`When used in a statute [words] must be construed in context, keeping in mind the nature and obvious purpose of the statute where they appear.' [Citations.] Moreover, the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole."'" (Ibid.) If the language is clear and a literal construction would not result in absurd consequences that the Legislature did not intend, the plain meaning governs. (Coalition of Concerned Communities, Inc. v. City of Los Angeles (2004) 34 Cal.4th 733, 737 [21 Cal.Rptr.3d 676, 101 P.3d 563].) "[I]f a statute is amenable to two alternative interpretations, the one that leads to the more reasonable result will be followed [citation]." (Lungren v. Deukmejian (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].) When the language is ambiguous, we may consider a variety of extrinsic aids, including the purpose of the statute, legislative history, and public policy. (Coalition of Concerned Communities, Inc., supra, at p. 737.)

2. Creating a Private Right of Action

(3) A statute creates a private right of action only if the enacting body so intended. (Moradi-Shalal v. Fireman's Fund Ins. Companies (1988) 46 Cal.3d 287, 305 [250 Cal.Rptr. 116, 758 P.2d 58]; Crusader Ins. Co. v. Scottsdale Ins. Co. (1997) 54 Cal.App.4th 121, 131 [62 Cal.Rptr.2d 620].) In Moradi-Shalal, the court determined that the language of the statute it was considering did not create a private right of action and the legislative history did not indicate an intent to create a private right of action. (Moradi-Shalal, supra, at pp. 295, 304.) The court stated: "The fact that neither the Legislative Analyst nor the Legislative Counsel observed that the new act created a private right of action is a strong indication the Legislature never intended to create such a right of action." (Id. at p. 300.)
Subsequent decisions have held that a statute creates a private right of action only if the statutory language or its legislative history affirmatively indicates such an intent. (Vikco Ins. Services, Inc. v. Ohio Indemnity Co., supra, 70 Cal.App.4th at p. 62; Crusader Ins. Co. v. Scottsdale Ins. Co., supra, 54 Cal.App.4th at pp. 132-133, 135-137.) When the Legislature intends to create a private right of action, it will do so "directly" and "`"in clear, *1421 understandable, unmistakable terms."'" (Vikco, supra, at pp. 62-63.) That intent need not necessarily be expressed explicitly, but if not it must be strongly implied. (Id. at p. 62.) Particularly when regulatory statutes provide a comprehensive scheme for enforcement by an administrative agency, the courts ordinarily conclude that the Legislature intended the administrative remedy to be exclusive unless the statutory language or legislative history clearly indicates an intent to create a private right of action. (Id. at p. 66.)

3. The Relevant Statutes

Labor Code section 351 states: "No employer or agent shall collect, take, or receive any gratuity or a part thereof that is paid, given to, or left for an employee by a patron, or deduct any amount from wages due an employee on account of a gratuity, or require an employee to credit the amount, or any part thereof, of a gratuity against and as a part of the wages due the employee from the employer. Every gratuity is hereby declared to be the sole property of the employee or employees to whom it was paid, given, or left for. . . ."
Labor Code section 354 provides: "Any employer who violates any provision of this article [including section 351] is guilty of a misdemeanor, punishable by a fine not exceeding one thousand dollars ($1,000) or by imprisonment for not exceeding 60 days, or both." Labor Code section 355 authorizes enforcement of Labor Code section 351 by the Department of Industrial Relations. Specifically, Labor Code section 355 reads: "The Department of Industrial Relations shall enforce the provisions of this article. All fines collected under this article shall be paid into the State treasury and credited to the general fund." The policy underlying the statute is set forth as follows in Labor Code section 356: "The Legislature expressly declares that the purpose of this article is to prevent fraud upon the public in connection with the practice of tipping and declares that this article is passed for a public reason and can not be contravened by a private agreement. As a part of the social public policy of this State, this article is binding upon all departments of the State."

4. Interpreting Labor Code Section 351 to Determine Whether it Provides a Private Right of Action

(4) Here, the statutes provide for administrative enforcement of the tip protection law and they set forth a remedy other than private damages or restitution. The Department of Industrial Relations has the authority to enforce Labor Code section 351, and any violation of this statute results in the employer's being guilty of a misdemeanor and being fined up to $1,000 or imprisoned. (Lab. Code, งง 354 & 355.) The role of the Department of *1422 Industrial Relations is to prevent fraud upon the public. This agency does not have the authority to recover gratuities wrongfully taken by the employer.
By expressly stating in the statute that every gratuity is "the sole property of the employee or employees to whom it was paid, given, or left for" (Lab. Code, ง 351), the Legislature appears to be strongly implying that the employee has a private right of action; otherwise, the statute provides the employee with an unenforceable right. Code of Civil Procedure section 30 provides: "A civil action is prosecuted by one party against another for the declaration, enforcement or protection of a right, or the redress or prevention of a wrong."[4] As already stressed, the Department of Industrial Relations has no authority to enforce an employee's property interest. Consequently, any civil action to enforce the property right against an employer who has unlawfully taken an employee's tip can only be taken by an employee.
As noted earlier, in Lu, supra, 170 Cal.App.4th 466, the Second District has recently considered whether Labor Code section 351 creates a private right of action. The Lu court, however, did not take an extensive look at the legislative history; nor did it even consider the significance of the amendment to the statute providing the employee with a property right. Moreover, a federal court has considered this issue and also concluded there was no private right of action. In Matoff v. Brinker Restaurant Corp. (C.D.Cal. 2006) 439 F.Supp.2d 1035 (Matoff), the court applied California law when determining whether the plaintiff's claim under Labor Code section 351 should be dismissed because the statute did not create a private cause of action. The court noted that the statute provided for administrative enforcement and stated that it was not aware of any legislative history "that demonstrates a legislative intent to create a private right to sue." (Matoff, supra, at p. 1037.) The court without any further analysis held that the statute did not provide a private right of action.
Since there was little analysis in Matoff, and neither the federal court in Matoff nor the state court in Lu considered the significance of the language in the statute regarding the employee's property interest in the gratuity, we do not find these cases to be particularly persuasive. As already stressed, providing an employee with a property interest in his or her tips seems to indicate strongly that the Legislature intended to give the employee a private cause of action. Since no case has considered the significance of adding this *1423 right to the statute, we conclude that the statute is ambiguous and examine the legislative history and other Labor Code statutes to discern the Legislature's intent.
In Henning, supra, 46 Cal.3d 1262, our Supreme Court reviewed the history of Labor Code section 351 to determine whether a two-tiered minimum wage system for employees who receive tips was barred under the statute. The Henning court noted that, in 1917, the Legislature enacted the statute that was the precursor of Labor Code section 351. (Henning, supra, at p. 1270.) This statute prohibited an employer from collecting any tips, but the Supreme Court struck the 1917 statute down as violating principles of substantive due process. (Henning, supra, at pp. 1270-1271, citing In re Farb (1918) 178 Cal. 592, 598 [174 P. 320].) In response, the Legislature enacted the Statutes of 1929, which specified that whenever employers demanded a portion of any employee's tip they must provide notice in a conspicuous place of this policy. (Henning, supra, at p. 1271.) The policy underlying the statutes was "`to prevent fraud upon the public in connection with the practice of tipping . . . .'" (Henning, supra, at p. 1271.) The Statutes of 1929 also provided that the Department of Industrial relations "shall enforce the provisions hereof and all fines imposed and collected thereunder shall be paid into the state treasury and credited to the general fund."
In 1937, the Legislature codified the relevant provisions of the Statutes of 1929, modifying some, as sections 351, 352, 355, and 356 of the Labor Code. Labor Code section 351 remained a notice statute and simply required the employer to post any notice of a policy of collecting the employees' tips. (Henning, supra, 46 Cal.3d at pp. 1271-1272.) Section 352 required the notice to set forth the extent to which the employees were required by the employer to accept tips instead of wages. (Henning, supra, at p. 1272.) Section 356 reiterated that the purpose of the statute was to prevent fraud upon the public. (Henning, supra, at p. 1272.) Labor Code section 355 provided that the Department of Industrial Relations "shall enforce the provisions of this article." It further stated that all fines collected should be paid into the State Treasury and credited to the general fund. A violation of Labor Code sections 351 and 356 resulted in a misdemeanor punishment but did "not render void the [employment] agreement [between the employer and employee] with respect to the ownership or application of the tips." (Anders v. State Board of Equalization (1947) 82 Cal.App.2d 88, 97 [185 P.2d 883].)
Labor Code sections 351 and 352 were amended in 1965, but they remained notice statutes. In 1968, the Industrial Welfare Commission (IWC) established a "tip credit" system, which permitted an employer to credit gratuities towards the minimum wage. (Henning, supra, 46 Cal.3d at pp. 1272-1273.)
*1424 In 1965, the Legislature amended Labor Code sections 350 and 351 to indicate that the employer must post the notice of taking the employees' tips in a conspicuous place. (Henning, supra, 46 Cal.3d at p. 1272.) The law since 1937 and before 1965 merely provided that the notice had to be posted. The amended statutes provided that unless notice was conspicuously posted, the employer could not take any part of the gratuities. (Lab. Code, former งง 350 & 351.)
In 1972, Assemblyman Leroy F. Greene introduced a bill to amend Labor Code former section 351 to remove the notice provision and to declare that every gratuity is the sole property of the employee. (Henning, supra, 46 Cal.3d at p. 1273.) "The opinion of the Legislative Counsel on the effect of [this bill] was in relevant part as follows. `[This bill], as introduced, would delete provisions of law that now, broadly speaking, enable employers to obtain the benefit (as, in effect, the payment of wages) of tips and other gratuities received by their employees, and thereby prohibit an employer from receiving such a benefit.'" (Ibid.) Additionally, the opinion stated that the regulations permitting the tip crediting would be invalid. (Ibid.) Assemblyman Greene wrote the following statement in a memorandum: "`The basis for this legislation would appear to be that tips or gratuities are given for individual excellence of service above and beyond the basic duties of the employment, and as such, the employer has no vested right to consider tips a part of wages.'" (Id. at p. 1275, italics added.) This bill, however, "died" in committee. (Henning, supra, at p. 1273.)
The following year, in 1973, Assemblyman Greene introduced Assembly Bill No. 10 (1973-1974 Reg. Sess.), which was identical in relevant part to the bill introduced the prior year. (Henning, supra, 46 Cal.3d at p. 1273.) The Legislature retained the provision declaring tips to be the employee's property, but added a provision to preserve the validating of the tip credit system. (Id. at p. 1274.) Labor Code former section 351 stated in relevant part: "`No employer or agent shall collect, take, or receive any gratuity or a part thereof, paid, given to or left for an employee by a patron, or deduct any amount from wages due an employee on account of such gratuity, or require an employee to credit the amount . . . due the employee from the employer, except to the extent that may be permitted by a valid regulation of the California Division of Industrial Welfare . . . . Every such gratuity is hereby declared to be the sole property of the employee or employees to whom it was paid, given, or left for [sic].'" (Henning, supra, at p. 1274.)
In 1974, the Legislature again considered a bill that would amend Labor Code section 351 to bar any crediting of tips. (Henning, supra, 46 Cal.3d at *1425 p. 1275.) A memorandum by the Senate Committee on Industrial Relations stated that "`[t]he effect of this bill would be to require employers to pay employees at least the minimum wage regardless of the amount of tips the employees receive.'" (Henning, supra, at p. 1275.) In 1975, the Legislature amended the statute by deleting the crediting exception and thereby revoking the authority of the IWC to allow an employer to obtain the benefit of tips received by its employees. (Henning, supra, at p. 1275.)
A careful consideration of this legislative history supports a conclusion that the Legislature, in 1973, intended to provide employees with a private right of action to recover any tips unlawfully taken by their employers. In 1929, when tips were not considered the property of the employees, employers could take a portion of the tips as long as they provided notice of this practice to the public. The policy concern was that the public should be aware that the employees were not receiving all of the tip money. The statutes gave the Department of Industrial Relations the authority to protect the public's interest and this agency could prosecute the employer for any violation of the notice or recordkeeping requirements. Violations resulted in a misdemeanor punishment.
Assemblyman Greene, however, made it plain that the purpose of amending Labor Code section 351 to strike the notice provision and to prohibit an employer from collecting any of the tip money was to make it clear that the employer did not have a vested interest in this money. No corresponding legislation expanded the authority of the Department of Industrial Relations to prosecute an action to enforce or recover this newly created property interest of the employees. Thus, the only way for an employee to recover money unlawfully taken by an employer would be for the employee to bring his or her own civil action. Accordingly, it would be an absurd construction to interpret the statute as giving an employee a property right in the gratuity with no means of enforcing that right.
The casino argues that if the Legislature intended to provide a private right of action, it would have expressly stated that. It claims that the Legislature made its intention clear in Labor Code section 1194, subdivision (a), which reads: "Notwithstanding any agreement to work for a lesser wage, any employee receiving less than the legal minimum wage or the legal overtime compensation applicable to the employee is entitled to recover in a civil action the unpaid balance of the full amount of this minimum wage or overtime compensation, including interest thereon, reasonable attorney's fees, and costs of suit."
*1426 (5) We conclude, however, that Artichoke Joe's ignores the context of Labor Code section 1194. Labor Code sections 98 through 98.2 confer authority on the commissioner to adjudicate wage claims through an administrative process. Since employees have an administrative remedy, the Legislature needed to specify that an employee could also bring a "civil action."
In contrast, an employee has no administrative remedy when an employer unlawfully collects the employee's tips. Accordingly, the Legislature did not need to specify in Labor Code section 351 that there could be a civil action because the only method for recovering a tip is a civil action.
The Lu court determined that the Labor Code Private Attorneys General Act of 2004 (PAGA; Lab. Code, ง 2698 et seq.), provides further support for its holding that Labor Code section 351 confers no right of action on private parties. (Lu, supra, 170 Cal.App.4th at p. 476.) In relevant part, PAGA provides, "Notwithstanding any other provision of law, any provision of [the Labor Code] that provides for a civil penalty to be assessed and collected by the Labor and Workforce Development Agency or any of its departments, divisions, commissions, boards, agencies, or employees, for a violation of this code, may, as an alternative, be recovered through a civil action brought by an aggrieved employee on behalf of himself or herself and other current or former employees pursuant to the procedures specified in Section 2699.3." (Lab. Code, ง 2699, subd. (a).) PAGA establishes a default penalty and a private right of action for an aggrieved employee for violations of "all provisions of [the Labor Code] except those for which a civil penalty is specifically provided . . . ." (Lab. Code, ง 2699, subds. (f), (g)(1).) Employees also have the right "to pursue or recover other remedies available under state or federal law, either separately or concurrently with an action taken under this part." (Lab. Code, ง 2699, subd. (g)(1).)
(6) The Lu court concluded that "[t]he enactment of PAGA as an enforcement vehicle implies a legislative recognition that a direct, private cause of action under [Labor Code section] 351 . . . is not viable." (Lu, supra, 170 Cal.App.4th at p. 476.) We, however, do not agree that PAGA bars a private action to recover tip money wrongly taken. PAGA "empowers or deputizes an aggrieved employee to sue for civil penalties `on behalf of himself or herself and other current or former employees' (ง 2699, subd. (a)), as an alternative to [Labor and Workforce Development Agency] enforcement. . . ." (Dunlap v. Superior Court (2006) 142 Cal.App.4th 330, 337 [47 Cal.Rptr.3d 614].) Here, Grodensky is not suing for civil penalties but to recover the tip money wrongfully taken.
*1427 (7) Finally, we believe that there is an additional policy reason for concluding that Labor Code section 351 creates a private right of action. Here, as was the situation in Lu, plaintiff also included a UCL action. It would not be good policy to require a plaintiff always to include a UCL action whenever the plaintiff is deprived of his or her tips by the employer. Rather, employees should be able to recover their tips by a simple action under Labor Code section 351.
(8) We conclude that the context of the statutes and the legislative history confirm that the Legislature intended to provide employees with a private right of action under Labor Code section 351. This action is not duplicative of any action that can be taken by an administrative agency. Further, as discussed earlier, it would be an absurd result to bestow employees with a property interest in their tips, but then deprive them of any means to recover their property.

C. Claim for Restitution Under the UCL

The trial court found that paying a portion of the dealers' tips to the shift managers violated the UCL (Bus. & Prof. Code, ง 17200 et seq.). Business and Professions Code section 17203 provides in relevant part: "Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments . . . as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition. . . ."
(9) "A UCL action is an equitable action by means of which a plaintiff may recover money or property obtained from the plaintiff or persons represented by the plaintiff through unfair or unlawful business practices. It is not an all-purpose substitute for a tort or contract action. `[D]amages are not available under [Business and Professions Code] section 17203.'" (Cortez v. Purolator Air Filtration Products Co. (2000) 23 Cal.4th 163, 173 [96 Cal.Rptr.2d 518, 999 P.2d 706] (Cortez).)
The casino does not challenge the lower court's findings that a violation of Labor Code section 351 supports a UCL cause of action. However, it argues that the trial court erred in determining that the dealers could receive the remedy of restitution.[5] Artichoke Joe's maintains that the components necessary for restitution were not present here. Additionally, it asserts that the *1428 equities of the situation dictate that it should not have to disgorge any portion of the tip money given to the shift managers.

1. Standard of Review

(10) The casino maintains that the issue of restitution is a mixed question of law and fact. The casino, however, is not arguing that the UCL claim was invalid; rather, it is challenging the order of restitution. Once an unfair business practice has been shown under Business and Professions Code section 17203, the court "`may make such orders or judgments . . . as may be necessary to prevent the use or employment . . . of any practice which constitutes unfair competition . . . or . . . to restore . . . money or property.' [Citation.] That is, as our cases confirm, a grant of broad equitable power. A court cannot properly exercise an equitable power without consideration of the equities on both sides of a dispute." (Cortez, supra, 23 Cal.4th at p. 180.) Accordingly, we review the court's order of restitution for abuse of discretion.

2. The Remedy of Restitution in a Tip Pooling Case

(11) Restitution under the UCL includes two separate components. "The offending party must have obtained something to which it was not entitled and the victim must have given up something which he or she was entitled to keep." (Day v. AT & T Corp. (1998) 63 Cal.App.4th 325, 340 [74 Cal.Rptr.2d 55].) Restitution is available where "`a defendant has wrongfully acquired funds or property in which a plaintiff has an ownership or vested interest.'" (Feitelberg v. Credit Suisse First Boston, LLC (2005) 134 Cal.App.4th 997, 1012 [36 Cal.Rptr.3d 592].) The Supreme Court has defined orders for restitution as "orders compelling a UCL defendant to return money obtained through an unfair business practice to these persons in interest from whom the property was taken, that is, to persons who had an ownership interest in the property or those claiming through that person." (Kraus v. Trinity Management Services, Inc. (2000) 23 Cal.4th 116, 126-127 [96 Cal.Rptr.2d 485, 999 P.2d 718].)
*1429 Artichoke Joe's contends that neither component of restitution was present in this case. The casino maintains that the trial court found that it did not keep any of the tip money for itself and therefore, according to the casino, it could not have obtained anything to which it was not entitled. Further, it insists that courts have held that tips belong to all of the employees serving the customers and therefore the dealers did not have an exclusive ownership interest in the tips.
The casino argues that the court in Leighton v. Old Heidelberg, Ltd. (1990) 219 Cal.App.3d 1062, 1070 [268 Cal.Rptr. 647] (Leighton) made it clear that tipping pools are legal and as long as the employer does not keep the money, there is no violation. In Leighton, the appellate court held that requiring a waitress to share her tips with the employer's busboys was not prohibited by Labor Code section 351. (Leighton, supra, at p. 1070.) The court explained that, "if more than one employee, for example a waitress and a busboy, directly serve the table of a patron, the gratuity is left for the `employees' within the meaning of [Labor Code] section 351, and thereunder becomes their sole property as against the employer, to be equitably distributed between them." (Ibid., fn. omitted.) The court cautioned, "Under the tip pooling arrangement in this case, there is no way in which a gratuity can be appropriated by the employer either for himself or to make up part of an employee's wages . . . ." (Id. at pp. 1070-1071.)
Under Labor Code section 351, Grodensky and the other dealers had a property interest in the tips given to them. (See also Matoff, supra, 439 F.Supp.2d at pp. 1038-1039 [rejected defendant restaurant's argument that restitution under the UCL was improper because the tips the employee sought to recover were in possession of the bartenders rather than the restaurant when the restaurant directed that the funds be given to the bartenders].) Consistent with the clear mandate of the Labor Code and the reasoning of Leighton, the dealers have a property interest in the tips. The fact that other employees in addition to the dealers had a property interest in the dealers' tips did not eviscerate the dealers' property interest in their tips.
Further, the present situation is significantly different from the one in Leighton. In Leighton, the defendant restaurant had not violated Labor Code section 351. However, the Leighton court made it clear that tips could not be kept by the employer or its agents. (Leighton, supra, 219 Cal.App.3d at p. 1065.) The Leighton court stated that when several people attend to the table the tips belong to all of the employees and they never belong to the employer or to the employer's agents. Thus, the tips were the property of both the waitresses and the busboys. Here, the trial court found that the casino did not keep any money for itself but it determined that the shift *1430 managers were agents of the casino and they illegally received a portion of the dealers' gratuities.
(12) It is undisputed that Artichoke Joe's instituted a mandatory tip pool effective October 26, 1998. The record establishes that the casino obtained the dealers' tips and then distributed a portion of them to the shift managers. Dealers were to pay a set hourly amount into the tip pool of $3 or $5 per hour, depending upon their shift, regardless of the amount of tips actually received. The payments to shift managers were pursuant to a point system where shift managers received six points per eight-hour shift, and points were worth approximately $15 to $17 each. The parties stipulated that the amount of money taken from the 78 dealers in the class that was paid to shift managers by the casino was $344,761.93. Thus, the record supported the lower court's finding that the casino took the tips given to the dealers and distributed a portion of this property to its agents, the shift managers, in violation of Labor Code section 351.
In addition to the Leighton case, the casino cites Bradstreet v. Wong (2008) 161 Cal.App.4th 1440 [75 Cal.Rptr.3d 253] (Bradstreet), and quotes the following language: "In the absence of a finding that intervener performed labor for defendants personally, rather than for the benefit of Wins Corporations, or that defendants appropriated for themselves corporate funds that otherwise would have been used to pay the unpaid wages, we agree with the trial court's conclusion that an order requiring defendants to pay the unpaid wages would not be `restitutionary as it would not replace any money or property that defendants took directly from' intervener." (Id. at p. 1460.)
In citing the foregoing language to support its argument that restitution was not an appropriate remedy, the casino ignores the fact that the court in Bradstreet was concerned with the principals of the corporation, not the corporation. (Bradstreet, supra, 161 Cal.App.4th at p. 1460.) In Bradstreet, former employees brought a claim under the UCL against the principals of closely held garment corporations and sought restitution. (Bradstreet, at pp. 1458-1461.) The court explained that the issue before it was whether these individual defendants, "who were not the employers, and who were not found to have required any employee to work for them personally, or to have misappropriated corporate funds for their own use, may also be required to pay the earned but unpaid wages as restitution." (Id. at p. 1459, fn. omitted.) The court noted that the labor was for the benefit of the employer; the employer, not the individuals, was obliged to pay the wages. (Id. at p. 1460.)
(13) Indeed, the casino's reliance on Bradstreet is particularly surprising given that the court made it clear that restitution could be properly ordered against the corporation or the actual employer. (Bradstreet, supra, 161 *1431 Cal.App.4th at p. 1459.) The court explained: "Nor is there any dispute that the unpaid wages could be recovered from the Wins Corporations as restitution pursuant to Business and Professions Code section 17203. `[A]n order that a business pay to an employee wages unlawfully withheld is consistent with the legislative intent underlying the authorization in [Business and Professions Code] section 17203 for orders necessary to restore to a person in interest money or property acquired by means of an unfair business practice.' [Citation.] `The employer has acquired the money to be paid by means of an unlawful practice that constitutes unfair competition as defined by [Business and Professions Code] section 17200. The employee is, quite obviously, a "person in interest" [citation] to whom that money may be restored. The concept of restoration or restitution, as used in the UCL, is not limited only to the return of money or property that was once in the possession of that person. The commonly understood meaning of "restore" includes a return of property to a person from whom it was acquired [citation], but earned wages that are due and payable pursuant to section 200 et seq. of the Labor Code are as much the property of the employee who has given his or her labor to the employer in exchange for that property as is property a person surrenders through an unfair business practice. An order that earned wages be paid is therefore a restitutionary remedy authorized by the UCL. The order is not one for payment of damages.'" (Id. at p. 1459.)
Similarly, the casino's citations to other cases that do not involve the misappropriation of an employee's gratuity by the employer have no bearing on the issue before us. (See, e.g., McBride v. Boughton (2004) 123 Cal.App.4th 379, 389-390 [20 Cal.Rptr.3d 115] [man who falsely believed that he was the child's biological father and provided financial support to the child did not have a claim of unjust enrichment against biological mother and her husband]; Cruz v. U.S. (N.D.Cal. 2002) 219 F.Supp.2d 1027, 1041-1042 [in a lawsuit by individuals from Mexico who claimed they were owed money withheld from their wages while working in the United States during World War II, the court dismissed their claim for unjust enrichment against the bank when the bank, which had held the deposited money and then transferred it to a Mexican bank, was merely an intermediary and had received no benefit from the plaintiffs]; Inline, Inc. v. Apace Moving Systems, Inc. (2005) 125 Cal.App.4th 895, 903 [23 Cal.Rptr.3d 216] [owner of goods stored at warehouse by third party could only receive the amount of money that the warehouse received from selling the goods and not the goods' fair market value]; Korea Supply Co. v. Lockheed Martin Corp. (2003) 29 Cal.4th 1134, 1149 [131 Cal.Rptr.2d 29, 63 P.3d 937] [restitution not the proper remedy because plaintiff did not have an ownership interest in the property].)
Finally, the casino argues that ordering the return of the tip money distributed to the shift managers would not restore the "status quo" because the money now belongs to the shift managers, not the casino. It is irrelevant *1432 that the casino did not keep the money and chose to distribute it to other parties, because the other parties are agents of the casino. "The object of restitution is to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest." (Korea Supply Co. v. Lockheed Martin Corp., supra, 29 Cal.4th at p. 1149.) Thus, restoring the status quo in the present case is returning this wrongfully obtained money to the dealers.
Accordingly, we conclude that the dealers had a property interest in their tips under Labor Code section 351, and the trial court did not abuse its discretion in ordering the disgorgement of the sum taken from the dealers' tips and distributed to the casino's agents.

3. The Equities

Artichoke Joe's notes that the trial court has the discretion to deny equitable relief even if it finds a violation of the UCL. (See Cortez, supra, 23 Cal.4th at p. 179.) It claims that the lower court "committed error by" not finding that a consideration of the equities mandated the denial of any equitable relief. As already stressed, we review the lower court's "very broad" discretion in granting equitable relief for an abuse of discretion. (See Bus. & Prof. Code, ง 17203; Cortez, supra, at p. 180.)
(14) The Supreme Court in Cortez stated "that equitable considerations may enter into the court's disposition of a UCL action." (Cortez, supra, 23 Cal.4th at p. 179, italics added.) The court continued: "We agree that equitable defenses may not be asserted to wholly defeat a UCL claim since such claims arise out of unlawful conduct. It does not follow, however, that equitable considerations may not guide the court's discretion in fashioning the equitable remedies authorized by [Business and Professions Code] section 17203." (Ibid.) The court proceeded to explain that the lower court must consider the equities when fashioning an equitable remedy. (Id. at pp. 179-180.) The Supreme Court pointed out that "[n]ormally, however, the plaintiff need not show that a UCL defendant intended to injure anyone through its unfair or unlawful conduct. The UCL imposes strict liability when property or monetary losses are occasioned by conduct that constitutes an unfair business practice." (Id. at p. 181.)
In the present case, the trial court did consider the equity defenses and determined that the casino "failed to demonstrate any and all of these affirmative defenses by a preponderance of the evidence." For the reasons set forth below, we conclude that the lower court did not abuse its discretion in determining that the affirmative defenses did not exempt Artichoke Joe's from liability.

*1433 a. The Tip Pool's Benefit to the Dealers and Its Use in the Industry

The casino maintains that the evidence established that a tip pool saves a dealer time and money and is a long-standing industry practice. The casino argues that it did not want to institute the tip pool, which is a financial burden for it to administer, but did so primarily to benefit the dealers and to satisfy the IRS. (See Freis v. Soboroff (2000) 81 Cal.App.4th 1102, 1103 [97 Cal.Rptr.2d 429] (Freis); Otworth v. Southern Pac. Transportation Co. (1985) 166 Cal.App.3d 452, 458 [212 Cal.Rptr. 743] (Otworth).) Moreover, it asserts that the dealers had accepted tax-free income under the TRDA since October 1998, and they should not now be allowed to receive restitution based on the tip pool created by the TRDA. Further, the casino argues that the amount required by the tip pool was less than the amount voluntarily paid by the dealers before the tip pool became mandatory. Additionally, it stresses that the mandatory tip pool relieved the dealers from having to worry about tipping out others.
The cases cited by the casino are inapplicable because, unlike the present situation, the IRS required the actual withholding of money in the cited decisions. In Freis, supra, 81 Cal.App.4th 1102, the owner of certain gas and oil royalties payable by the City of Los Angeles (the city) refused to provide a Social Security number for the purpose of taxpayer identification and the city withheld 31 percent of the payments as backup withholding for federal income taxes, as required by federal statutes and the IRS regulations. (Id. at p. 1103.) The owner sued the city and various officials for conversion and breach of contract; the appellate court affirmed the dismissal of these claims because the federal law required the city to withhold portions of the royalty payments for taxes. (Id. at p. 1104.)
Similarly, in Otworth, supra, 166 Cal.App.3d at page 458, the court held that the employee had no claim for conversion against the employer based on the employer's withholding taxes as directed by the IRS. The court noted that the employee did not allege that he was entitled to possession of the withheld money; nor did he assert that the withholding of the money by the employer was unlawful. (Ibid.)
In contrast to both Freis and Otworth, here, the trial court expressly found that the IRS did not require the tip pooling that Artichoke Joe's imposed. Indeed, as the trial court noted, Willson admitted at trial that there was no correspondence from the IRS demanding or mandating a tip pool. Further, in the present case, there was no correlation between the tip pool and the tip rate for purposes of IRS declaration of income. The court further found that *1434 Willson, not the IRS, came up with the rate to be declared as tips; he also proposed the methodology set forth in the TRDA. Moreover, contrary to the casino's assertions, the casino did have an interest in the tip pools; Willson testified that he would require a tip-out to floor and shift managers even if there had not been an agreement with the IRS. Unlike the situations in the cases cited by the casino, here, the dealers were entitled to the tips and the casino's collecting and distributing the gratuities to the shift managers was unlawful and not mandated by the IRS.
The casino's argument that dealers paid more when they voluntarily tipped out than they do now under the mandatory tipping pool does not require the trial court to reject the remedy of restitution. Prior to the mandatory tip pooling policy, a dealer could choose whether to give money to other employees and the amount to give. Moreover, under the law, tipping of the shift managers was an illegal practice (Lab. Code, ง 351) and therefore it should not have occurred under either a voluntary or a mandatory policy.
(15) We also disagree with Artichoke Joe's assertion that it did not benefit from the mandatory tipping pool. Both the employer and the employee benefit by the patrons receiving good service and by the employees receiving increased wages as a result of a gratuity. (See Rihn v. Franchise Tax Board (1955) 131 Cal.App.2d 356, 361 [280 P.2d 893].) "`["]The usual tips have come to be considered as a part of the cost of entertainment . . ., and it is realized both by the person paying and receiving them that it is a part payment of the wages which the employer compels the persons served to pay. In effect, therefore, the employer and not the employee alone is benefited by the patrons of the company."'" (Ibid.)
Finally, Artichoke Joe's points out that Grodensky and the class did not prevail on their claim that requiring the dealers to share their tips with floor managers, board persons, and chip sellers violated Labor Code section 351. They were only successful in arguing that the requirement to share the tips with shift managers violated the statute. We note, however, that the lower court found that the class was the prevailing party in the lawsuit and that particular ruling has not been challenged on appeal. The trial court narrowly fashioned its remedy by ordering restitution only for the money wrongfully given to the shift managers. Since the casino violated the law by requiring the dealers to share their tips with the shift managers, the ordering of restitution was proper.
Accordingly, we conclude that a consideration of the equities does not establish that the lower court abused its discretion in ordering restitution.

*1435 b. Estoppel, Waiver, and Laches

Artichoke Joe's asserts that the doctrine of estoppel should prevent the equitable remedy of restitution. It also maintains that the affirmative defenses of waiver and laches apply. We conclude, however, that the evidence in the record does not support these defenses.
(16) There are four factors generally required to establish estoppel: "`"(1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had the right to believe that it was so intended; (3) the party asserting the estoppel must be ignorant of the true state of facts; and, (4) he must rely upon the conduct to his injury."'" (Spray, Gould & Bowers v. Associated Internat. Ins. Co. (1999) 71 Cal.App.4th 1260, 1268 [84 Cal.Rptr.2d 552].) A party to be estopped typically will have engaged in affirmative conduct that misled the other party. (Ibid.)
The record does not support the casino's assertion of estoppel. Most obviously, the record shows unequivocally that Artichoke Joe's implemented the mandatory tip pool and therefore it was not the dealers' conduct that caused Artichoke Joe's to act. Further, since Artichoke Joe's implemented the tip pool, it was clear as to the true state of facts. Thus, the casino's assertion of estoppel is entirely without merit.
(17) The casino's argument that laches applies is similarly baseless. The affirmative defense of laches may be applied to bar relief to a plaintiff who has delayed unduly in seeking relief. (Concerned Citizens of Palm Desert, Inc. v. Board of Supervisors (1974) 38 Cal.App.3d 257, 265 [113 Cal.Rptr. 328].) A defendant seeking to apply the affirmative defense must demonstrate prejudice, making it unjust to grant the relief to plaintiff. (San Bernardino Valley Audubon Society v. City of Moreno Valley (1996) 44 Cal.App.4th 593, 607 [51 Cal.Rptr.2d 897].) Artichoke Joe's has not presented any evidence that the dealers unreasonably delayed their action or that it suffered any prejudice as a result of any alleged delay. Accordingly, the casino has completely failed to establish that laches applies.
(18) Finally, Artichoke Joe's presents no argument or evidence to support its claim of waiver. Waiver is the intentional relinquishment of a known right after full knowledge of the facts and depends upon the intention of one party only. (Oakland Raiders v. Oakland-Alameda County Coliseum, Inc. (2006) 144 Cal.App.4th 1175, 1189 [51 Cal.Rptr.3d 144].) "`Waiver always rests upon intent. Waiver is the intentional relinquishment of a known right after *1436 knowledge of the facts.' [Citations.] The burden, moreover, is on the party claiming a waiver of a right to prove it by clear and convincing evidence that does not leave the matter to speculation, and `doubtful cases will be decided against a waiver' . . . ." (City of Ukiah v. Fones (1966) 64 Cal.2d 104, 107-108 [48 Cal.Rptr. 865, 410 P.2d 369].) (19) Labor Code section 356 expressly states that the restrictions against the taking of tips paid to employees is a matter of public policy, which cannot be waived by the parties involved.
We therefore agree with the lower court that Artichoke Joe's has failed to prove an affirmative defense.

D. Attorney Fees

Artichoke Joe's contends that the lower court erred in determining that Grodensky was entitled to attorney fees as a private attorney general under Code of Civil Procedure section 1021.5.

1. Standard of Review and Code of Civil Procedure Section 1021.5

"`On review of an award of attorney fees [pursuant to Code of Civil Procedure section 1021.5] after trial, the normal standard of review is abuse of discretion. However, de novo review of such a trial court order is warranted where the determination of whether the criteria for an award of attorney fees and costs in this context have been satisfied amounts to statutory construction and a question of law.'" (Connerly v. State Personnel Bd. (2006) 37 Cal.4th 1169, 1175 [39 Cal.Rptr.3d 788, 129 P.3d 1].) Under some circumstances, the question whether attorney fees can be awarded "may be a mixed question of law and fact and, if factual questions predominate, may warrant a deferential standard of review." (Ibid.) If the material facts are largely undisputed and the question posed involves the interpretation or application of the statute, the question posed is one of law and subject to de novo review. (Id. at pp. 1175-1176.)
Artichoke Joe's contends that the material facts are undisputed, but it then proceeds to argue the facts. Moreover, it is not challenging the construction of the statute, but the court's application of the statute. Thus, the issues presented are a mixed question of law and fact and, to the extent the factual questions predominate, we apply the deferential abuse of discretion standard of review. (Connerly v. State Personnel Bd., supra, 37 Cal.4th at p. 1175.) "`The pertinent question is whether the grounds given by the court for its [order] . . . are consistent with the substantive law of [Code of Civil *1437 Procedure] section 1021.5 and, if so, whether their application to the facts of this case is within the range of discretion conferred upon the trial courts under section 1021.5, read in light of the purposes and policy of the statute.'" (Feminist Women's Health Center v. Blythe (1995) 32 Cal.App.4th 1641, 1666-1667 [39 Cal.Rptr.2d 189].)
(20) Code of Civil Procedure section 1021.5 provides: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any. . . ." If the trial court determines any one of the multiple elements required for an award under Code of Civil Procedure section 1021.5 is absent, that alone will suffice to deny the fee request. (Satrap v. Pacific Gas & Electric Co. (1996) 42 Cal.App.4th 72, 81 [49 Cal.Rptr.2d 348] (Satrap).)

2. Prevailing Party

The trial court found that Grodensky and the class members were the successful parties under Code of Civil Procedure section 1021.5 because they were awarded monetary damages and injunctive relief. The court noted that a party need not prevail on every claim to be considered a successful party within the meaning of this statute. (Lyons v. Chinese Hospital Assn. (2006) 136 Cal.App.4th 1331, 1351-1356 [39 Cal.Rptr.3d 550] (Lyons).)
The casino in its briefs in this court does not challenge the trial court's finding on the prevailing party. "`[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration. [Citations.]' [Citations.] This principle is especially true when an appellant makes a general assertion, unsupported by specific argument, regarding insufficiency of evidence. [Citation.]" (People v. Stanley (1995) 10 Cal.4th 764, 793 [42 Cal.Rptr.2d 543, 897 P.2d 481]; see also Berger v. Godden (1985) 163 Cal.App.3d 1113, 1119 [210 Cal.Rptr. 109].) The casino has therefore waived any challenge to the lower court's ruling on the prevailing party.

3. Substantial Benefit and Public Interest

With regard to the enforcement of an important right affecting the public interest, the trial court found the following: "[A] significant public benefit *1438 was obtained not just for the members of the class, but as to all card room dealers whether or not they participated in the case, as it freed them from the restrictions of a mandatory tip sharing with shift managers. Indeed, the policy was abolished as a direct result of this litigation by plaintiff. Further, the court found that Artichoke Joe's violated Labor Code section 351, which is not only a civil wrong but also constitutes a public wrong under [Labor Code] section 354. In addition, it was defendant's position during the course of the litigation and the trial that tip sharing is commonplace in the gaming industry, and thus the ramifications of the plaintiffs' adjudication in their favor may have a domino effect upon other dealers at other card rooms. [ถ] These factors also support a finding that the action resulted in the enforcement of an important right under the Labor Code affecting the public interest. Indeed, in regard to the Labor Code violations upon which plaintiff and the class prevailed, the Legislature has expressly declared that the restrictions against taking of tips paid to employees is a matter of public policy for prevention of fraud upon the public."
Here, Grodensky's action did cause the enforcement of an important right. Not only did the current dealers benefit, but future dealers benefit as the court issued an injunction to prevent any policy requiring dealers to share their tips with shift managers. Additionally, as the trial court stated, the lawsuit did not simply benefit the dealers, but also benefited the public. The purpose of Labor Code section 351 is "to prevent fraud upon the public in connection with the practice of tipping . . . ." (Lab. Code, ง 356.)
Artichoke Joe's argues that Grodensky had to demonstrate that the lawsuit benefited the public and that he "was not motivated by his own pecuniary interests." It maintains that Grodensky presented no evidence on this issue. The question is not whether Grodensky had a pecuniary interest but whether the interests of all dealers and the public were incidental to Grodensky's primary objective of obtaining his tip money. (See, e.g., Planned Parenthood v. City of Santa Maria (1993) 16 Cal.App.4th 685, 691 [20 Cal.Rptr.2d 391].) When the interests of the public are incidental to the plaintiff's monetary interests, an award of attorney fees is not warranted. (Ibid.) In the present case, the trial court found that the litigation transcended Grodensky's financial interests, and the facts that he sought an injunction and obtained relief for current and future dealers support this finding. Additionally, as discussed above, the lawsuit did benefit the public by preventing Artichoke Joe's from fraudulently taking money left as tips for the dealers from the public. Therefore, the record supported a finding that the public interest trumped Grodensky's pecuniary interest in the lawsuit.
*1439 Accordingly, we conclude that the lower court did not abuse its discretion in finding that the lawsuit was brought to vindicate the public interest.

4. Disproportionate Financial Burden

Artichoke Joe's argues that Grodensky and the certified class did not establish that the necessity and financial burden of private enforcement made an award of attorney fees appropriate. The casino claims that Grodensky's pecuniary interest in the lawsuit and the amount of Grodensky's pecuniary interest provided him with a sufficient litigation incentive and therefore the lower court abused its discretion in awarding attorney fees.
The trial court found that the costs of prosecuting the case transcended the personal interest and personal stake of Grodensky and that it was anticipated that the cost to litigate the action would surpass the individual recovery to Grodensky. The court explained: "For example, even if plaintiff had won recovery of all of his contributions to the tip poolโwhich he did not winโhis damages would have been in the range of approximately $31,000 ($4.2 million collected in the pool, with 137 putative class members). This case was never a `sure thing,' and dealt with issues of first impression at the time commenced. It was a risky case, and also involved the dilemma of plaintiff and other class members suing their employer. That plaintiffs' class counsel would be expected to be compensated on a contingency basis does not undercut the propriety of a statutory award of fees under [Code of Civil Procedure] section 1021.5."
(21) Code of Civil Procedure section 1021.5 "is intended as a `bounty' for pursuing public interest litigation, not a reward for litigants motivated by their own interests who coincidentally serve the public. [Citations.] `The private attorney general theory recognizes citizens frequently have common interests of significant societal importance, but which do not involve any individual's financial interests to the extent necessary to encourage private litigation to enforce the right. [Citation.] To encourage such suits, attorneys fees are awarded when a significant public benefit is conferred through litigation pursued by one whose personal stake is insufficient to otherwise encourage the action.'" (California Licensed Foresters Assn. v. State Bd. of Forestry (1994) 30 Cal.App.4th 562, 570 [35 Cal.Rptr.2d 396].)
"`An award on the "private attorney general" theory is appropriate when the cost of the claimant's legal victory transcends his personal interest, that is, when the necessity for pursuing the lawsuit placed a burden on the plaintiff "out of proportion to his individual stake in the matter." [Citation.]'" (Woodland Hills Residents Assn., Inc. v. City Council (1979) 23 Cal.3d 917, 941 [154 Cal.Rptr. 503, 593 P.2d 200].) A court generally determines whether *1440 the litigation places a disproportionate burden on the individual by comparing the expected value of the litigation at the time it was commenced with the costs of litigation. (See Los Angeles Police Protective League v. City of Los Angeles (1986) 188 Cal.App.3d 1, 9-10 [232 Cal.Rptr. 697] (Los Angeles Police Protective League), overruled on the standard of review it used in Graham v. DaimlerChrysler Corp. (2004) 34 Cal.4th 553, 578 [21 Cal.Rptr.3d 331, 101 P.3d 140].)
In the present case, Grodensky claimed that the costs of litigation exceeded $650,000. The trial court determined that, even if Grodensky had won recovery of all of his contributions to the tip pool, his damages would have been about $31,000. The trial court further noted the risk of the lawsuit.
Rather than focus on what the court stated in its decision, Artichoke Joe's, in its opening brief in this court, asserts that Grodensky's argument was legally incorrect because he stated that the necessity prong should be evaluated by looking at the class's actual recovery ($439,009.55) discounted by his chances of winning, which he placed at 35 percent. This figure of the actual recovery discounted by his chance of winning was, according to Grodensky, much less than his costs of $650,000. The casino argues that using the actual recovery of $439,009.55 rather than the expected recovery is improper. (See Satrap, supra, 42 Cal.App.4th at p. 79.)
Artichoke Joe's argues that the expected recovery far exceeded the actual recovery. It maintains that the total value of the tip pool contributions was $4,283,553 and that Grodensky further sought liquidated damages in an amount equal to the value of the contributions, an award of statutory attorney fees, an award of punitive damages pursuant to the tort claim for unlawful conversion, and, on behalf of himself, an enhancement. The casino acknowledges that the court dismissed the tort claim before trial, but it maintains that Grodensky still valued his lawsuit as worth more than $9,367,000.[6] It asserts that, with a potential punitive damage award, the potential recovery at the time this case was filed could have exceeded $20 or $30 million.
The actual methodology proposed by Grodensky, but not used by the trial court, for obtaining the expected value has been used by some other courts. (See, e.g., Los Angeles Police Protective League, supra, 188 Cal.App.3d at pp. 9-10; Beasley v. Wells Fargo Bank (1991) 235 Cal.App.3d 1407, 1414 [1 Cal.Rptr.2d 459], overruled on issue of recovery of costs for expert fees in Olson v. Automobile Club of Southern California (2008) 42 Cal.4th 1142, 1151 *1441 [74 Cal.Rptr.3d 81, 179 P.3d 882].) However, as the Beasley court acknowledged, the actual value can only be used when there is little difference between the actual and expected value. (Beasley, supra, at p. 1414.) Here, the casino claims the expected value was over $9 million and Grodensky asserts the expected value was about $2.5 million. Even if we were to accept Grodensky's assertion that the expected value is $2.5 million, this amount significantly exceeds the actual recovery of $439,009.55. Thus, although it may be proper to use the actual value in some cases, it should not be used in the present case.
(22) The trial court, as already discussed, did not use the actual value of the recovery. The court's statement of decision makes it clear that it used Grodensky's expected recovery. In its reply brief, the casino for the first time argues that the lower court's analysis was incorrect because it used Grodensky's individual stake rather than the potential class recovery. We agree that when the court evaluates the estimated value of a case filed as a class action, a court must estimate the value of the entire case and not merely the value to each member of the proposed class. (Beasley v. Wells Fargo Bank, supra, 235 Cal.App.3d at p. 1415.)
As already noted, if any one of the multiple elements required for an award under Code of Civil Procedure section 1021.5 is absent, that alone will suffice to deny an attorney fee request. (Satrap, supra, 42 Cal.App.4th at p. 81.) Here, since the court did not use a proper method for assessing the element of disproportionate financial burden, we cannot determine whether it would have found this element present. We therefore remand for the trial court to consider this element using the proper methodology.
(23) When assessing the disproportionate financial burden, the trial court should use the two-step test, but use the expected (not the actual) value for the entire class (not the value for Grodensky individually). Thus, it should determine the expected value and then discount this benefit by some estimate of the probability of success at the time the vital litigation decisions were made. (Los Angeles Police Protective League, supra, 188 Cal.App.3d at p. 9.) The trial court, having heard all the evidence and arguments "is in a far better position than this court to assess what the plaintiff's realistic expected recovery was in this case, and we shall defer to its judgment." (Satrap, supra, 42 Cal.App.4th at p. 80.) Similarly, the trial court is in the best position to determine the reasonableness of Grodensky's estimate that the probability of success was 35 percent. Once the court determines the estimated value, it should compare this value to the actual litigation costs. (Los Angeles Police Protective League, supra, at p. 10.) In general, a fee award will be appropriate unless estimated value "exceeds by a substantial margin the actual litigation costs." (Ibid.)
*1442 Additionally, the trial court should consider whether the benefits achieved for others are high or minimal. (Los Angeles Police Protective League, supra, 188 Cal.App.3d at p. 10.) "Where the benefits achieved for others are very high it will be more important to encourage litigation which achieves those results. Accordingly, it will be more important to offer the bounty of a court-awarded fee than where the public benefits are less significant. Thus, the courts should be willing to authorize fees on a lesser showing of need than they might where the public benefits are less dramatic. This means the court sometimes should award fees even in situations where the litigant's own expected benefits exceed its actual costs by a substantial margin. [ถ] In contrast, where the public benefits are rather modest the courts should award fees only where the litigant's own expected benefits do not exceed its costs by very much (or possibly are even less than the costs of the litigation)." (Ibid.)

5. Fees from the Class Recovery

The trial court ruled: "The interests of justice would be advanced by not requiring that all fees be paid out of the recovery, given that the amount of fees would be most if not all of the monetary relief here. Further, where the `recovery' is non-monetary relief, such as injunctive relief, this prong of [Labor Code section] 1021.5 does not apply." The court cited Lyons, supra, 136 Cal.App.4th 1331. (See id. at pp. 1354-1355 [the trial court erred by simply looking at damages sought when plaintiff and counsel stated that they knew they were unlikely to prevail on the tort damages claim but they continued to pursue the injunctive relief even after the arbitrator denied the plaintiff any recovery on the tort claims and the plaintiff no longer had any personal stake in the outcome].)
Casino Joe's does not argue that the lower court abused its discretion in finding that the final element set forth in Code of Civil Procedure section 1021.5 was satisfied and therefore any appeal on this basis is waived. (See, e.g., People v. Stanley, supra, 10 Cal.4th at p. 793.) Further, the record amply supported a finding that this element was satisfied. Indeed, the attorney fees of $650,000 exceeded the amount of recovery, which was $493,009.55. (See Los Angeles Police Protective League, supra, 188 Cal.App.3d at p. 14 ["This disparity between financial burden and financial benefit is enough in itself to satisfy the [last] element of the section 1021.5 test."].) Additionally, Grodensky also sought an injunction, which was nonmonetary relief.
Although we are remanding for the trial court to use the proper test to determine whether the burden of private enforcement prong of Code of Civil Procedure section 1021.5 is satisfied and therefore attorney fees should be awarded, no other challenge to the award of attorney fees is proper. The trial *1443 court did not abuse its discretion in finding that the other elements of Code of Civil Procedure section 1021.5 were met.

II. The Appeal of Grodensky and the Class

A. The Tip Pool and Labor Code Section 351

Grodensky and the class maintain that requiring the dealers to participate in the tip pool violated Labor Code section 351. The trial court found that the mandatory tipping pool did not violate Labor Code section 351 and that only the employer and the employer's agents were barred by the statute from taking a portion of the tips. As discussed earlier (see discussion of rules of statutory construction, pt. I.B.1., ante), the interpretation of a statute is a question of law that we consider de novo on appeal. (Burden v. Snowden (1992) 2 Cal.4th 556, 562 [7 Cal.Rptr.2d 531, 828 P.2d 672].)
The question whether Labor Code section 351 permits an employer to require a tipping pool among employees has been addressed by other courts. In Leighton, supra, 219 Cal.App.3d 1062, the court considered a claim by a waitress that she was wrongfully discharged for refusing to share her tips with the busboys. In concluding that Labor Code section 351 did not bar an employer-mandated tipping pool, the court noted that the statute "expressly prohibits various employer practices," but the statute did not even mention tip pooling. (Leighton, supra, at p. 1067.) The court added that tip pooling has a long history among commercial establishments and, had the Legislature intended to prohibit such a practice, it could have done so, especially since Labor Code section 351 has been frequently amended. (Leighton, supra, at p. 1067.) The purpose of Labor Code section 351, according to the Leighton court was to "ensure that employees, not employers, receive the full benefit of gratuities that patrons intend for the sole benefit of those employees who serve them." (Leighton, supra, at p. 1068.) The court elaborated, "as spelled out in the language of the statute, [the purpose of the statute] is to prevent an employer from collecting, taking or receiving gratuity income or any part thereof, as his own as part of his daily gross receipts, from deducting from an employee's wages any amount on account of such gratuity, and from requiring an employee to credit the amount of the gratuity or any part thereof against or as a part of his wages." (Ibid.)
(24) In Leighton, the waitress argued that the restaurant had illegally taken her tip money because the tipping of the busboys was at the "behest" of the employer restaurant. (Leighton, supra, 219 Cal.App.3d at p. 1069.) In rejecting this argument, the Leighton court pointed out that the tip left by the patron is for the service provided and, as long as the employer does not obtain a portion of it, the tip may go to any of the employees directly *1444 servicing the table. (Ibid.) Further, Labor Code section 351 specifies that the gratuity is to be the "sole property" of the "employee or employees," and therefore the tip is the property of all employees that provide service. (Leighton, supra, at pp. 1068-1069.)
The Leighton court concluded that an employer-mandated tip pooling policy "is one of common sense and fairness, and protects the public, the employees and the restaurant employer. The public leaves a tip for those employees who actually service the table, and has a right to expect that those employees receive the gratuity to the exclusion of the employer." (Leighton, supra, 219 Cal.App.3d at p. 1070.) Such a policy ensures, the court explains, "a fair distribution of the gratuity to those who earned it, making certain that each [employee] gets his fair share." (Id. at p. 1071.) Further, this policy encourages the best possible service, which helps the employer by enhancing the restaurant's reputation. (Ibid.)
The holding in Leighton was followed by the appellate court in Jameson v. Five Feet Restaurant, Inc., supra, 107 Cal.App.4th 138 (Jameson). (See also Budrow v. Dave & Buster's of California, Inc. (2009) 171 Cal.App.4th 875 (Budrow) [Lab. Code, ง 351 does not require that those sharing in the tips at a restaurant directly serve the table].) In Jameson, the reviewing court affirmed the lower court's judgment that the restaurant's forcing the waitress to share her tips with floor managers violated Labor Code section 351. (Jameson, supra, at p. 143.) The court noted that tip pooling is permissible as long as no portion of the tip is collected by the employer or the employer's agent. (Ibid.) The court concluded that the record before it supported a finding that the floor manager was an agent of the employer restaurant. (Id. at pp. 144-145.)
A federal court, which conducted its own independent interpretation of Labor Code section 351, stated that it agreed with the reasoning of both Leighton and Jameson. (Louie v. McCormick & Schmick Restaurant Corp. (C.D.Cal. 2006) 460 F.Supp.2d 1153, 1157-1158.) In Louie, a waitress contended that the restaurant's policy of compelling her to share a portion of the tips left by the patrons she served with nonmanagerial employees who did not directly service those patrons at their tables violated Labor Code section 351. (Louie, supra, at p. 1156.) The federal court concluded that the statute "does not prohibit tip sharing among employees who are neither employers nor agents." (Id. at pp. 1157-1158.) It concluded, "Thus, the fact that an employer requires a server to pool tips with other service employees who do not hire, fire, supervise or control their co-workers does not constitute a `taking' as that term is used in [Labor Code section] 351." (Id. at p. 1158; see also Matoff, supra, 439 F.Supp.2d 1035 [employer-mandated tip pools are lawful under Lab. Code, ง 351].)
*1445 Grodensky and the class argue that the present case is distinguishable from those cases holding there is no violation of Labor Code section 351 because, here, patrons gave the tips directly to the dealers and Artichoke Joe's took the money and then distributed the money to various employees. Grodensky and the class maintain that Labor Code section 351 provides that a tip can be given to an employee or to employees and therefore the Legislature must not have intended that the tip be left for all workers who provided service, because then it would not have distinguished between employee and employees. They assert that, once the tips were given to the dealers and the customers' intention was that it was just for the dealers, the casino violated the statute by collecting the money and distributing it to other employees. Grodensky and the class proceed to cite the extensive legislative history that establishes that gratuities belong to the employees, and not to the employer.
Grodensky and the class further contend that the lower court improperly relied on Leighton; they maintain that Leighton is limited to the factual context of a waitress in a restaurant (see Brown v. Kelly Broadcasting Co. (1989) 48 Cal.3d 711, 734-735 [257 Cal.Rptr. 708, 771 P.2d 406] ["`[T]he language of an opinion must be construed with reference to the facts presented by the case, and the positive authority of a decision is coextensive only with such facts.'"]). They argue that Leighton and its progeny are limited to the "group tip" context and the Leighton court used equitable principles to conclude that the entire group of employees serving the customer was entitled to a portion of the tip left by the patron. Here, Grodensky and the class argue that, contrary to the "group tip" context, the trial court found the tips were left exclusively for the dealers. They maintain that the Leighton court did not hold that an employer could take a portion of tips belonging to one category of workers, pool them, and then distribute the money to other employees.
(25) Grodensky and the class's interpretation of the statute and their attempt to limit the holding to the factual context of a waitress in a restaurant or to what they refer to as the "group tip context" are unpersuasive. Grodensky and the class claim that the plain language of the statute distinguishes between gratuities "given to an employee" and those "left for employees" and tips for an employee or employees. However, the statute does not make such a distinction.[7] Labor Code section 351 prohibits an employer from taking any part of a gratuity that is "paid, given to, or left for an employee." It further states, "[e]very gratuity is hereby declared to be the *1446 sole property of the employee or employees to whom it was paid, given, or left for." (Ibid.) Thus, the statute indicates that the tip may be left for one employee but it may be the property of more than one employee. Moreover, Labor Code section 350, subdivision (e) defines a "`[g]ratuity'" for purposes of the statute as something that "has been paid or given to or left for an employee by a patron of a business over and above the actual amount due the business for services rendered or for goods, food, drink, or articles sold or served to the patron." We therefore conclude that the statute simply makes it clear that tips may be left for an employee and be the property of an employee or employees but tips left for an employee are never the property of an employer. (See also Searle v. Wyndham Internat., Inc. (2002) 102 Cal.App.4th 1327, 1332 [126 Cal.Rptr.2d 231].)
Grodensky and the class maintain that the situation involving the dealers is different from the one involving waitresses because in their situation they are directly given the money after patrons have winning hands. It is true that the lower court found that the patrons directly gave the dealers the money, but the court stressed that all of the employees were responsible for the customers' having a good experience while at the casino.[8] It also found that there was "overwhelming evidence" demonstrating that there had been a history of tip sharing by dealers with floor managers, shift managers, and other employees. Thus, dealers would not have voluntarily shared their tips with other employees if they did not recognize the other employees' contributions in making the customers satisfied. In any event, the application of the statute does not depend upon whether the customers know the money is being shared by all of the people serving them. The statute permits an employer to require an employee to share the tips with all of the employees serving or attending to the customers. Here, the record contained ample evidence to support a finding that all of the employees sharing in the tips serviced the patrons. The shift manager, Michael Sullivan, stated, "We all work together to make this work." The trial court noted that both the management and employees of Artichoke Joe's testified consistently that they worked together as a cohesive team to make the casino run smoothly and to keep the patrons happy. Similarly, the court in Louie v. McCormick & Schmick Restaurant Corp. held *1447 that requiring waitresses to share a portion of their tips with employees not directly serving the patrons at the tables did not violate Labor Code section 351. (Louie v. McCormick & Schmick Restaurant Corp., supra, 460 F.Supp.2d at pp. 1156-1158; see also Budrow, supra, 171 Cal.App.4th 875 [no direct table service requirement under Lab. Code, ง 351].)
We also agree with the trial court that it is immaterial that the casino took the money and then distributed it to other employees. The trial court pointed out that in the present case the casino must take the money first since the tips are left as chips, which must be given to the casino in order to be exchanged for cash. Likewise, often customers in restaurants do not leave cash as tips, but add the gratuity to the credit card bill. Thus, in the latter cases the restaurant temporarily controls the money; what is critical is that the restaurant cannot use the tip money.
Grodensky and the class attempt to circumscribe the holding of Leighton to situations involving an employee waitress and an employer restaurant or to what they refer to as a "group tip" context, but there is nothing in the language or reasoning of Leighton to support such a restriction. To the contrary, the court's interpretation of the statute applies to all factual situations where tipping is common. The Leighton court elaborated on the policy underlying its interpretation of the statute: "[A]s spelled out in the language of [Labor Code section 351, the purpose of the statute] is to prevent an employer from collecting, taking or receiving gratuity income or any part thereof, as his own as part of his daily gross receipts, from deducting from an employee's wages any amount on account of such gratuity, and from requiring an employee to credit the amount of the gratuity or any part thereof against or as a part of his wages." (Leighton, supra, 219 Cal.App.3d at p. 1068.) This policy applies with equal force to the present situation: the tipping of dealers. Labor Code section 351 simply prevents the casino or its agent from taking the gratuity as its own. Here, the casino took the money, but with the exception of giving a portion of the money to its agents, it did not violate the statute because the money was distributed to other employees.
We are also not persuaded by Grodensky and the class's attempt to distinguish Leighton from the present case by asserting that restaurants, unlike casinos, have a practice of tipping pools. We do not agree that a commercial establishment has to have a long-term practice to be able to impose a tipping pool. Labor Code section 351 does not make such a distinction. The Leighton court discussed the long-term nature of a tipping pool in restaurants simply to point out that the Legislature was aware of this practice and, therefore, the *1448 fact that the statute did not outlaw such a practice in any of its numerous amendments to the statute was significant.[9] (Leighton, supra, 219 Cal.App.3d at p. 1067.)
Grodensky and the class also take issue with what he asserts was the trial court's benefit analysis. The trial court found that the casino did not benefit from its temporary taking of the tips. They maintain that the casino did benefit because it did not have to pay the other employees as much money. We, however, are not concerned with whether the casino benefited from its tip pooling policy. The question before us is whether the mandated-tipping-pool policy violated Labor Code section 351. This question has already been answered in the negative by the Leighton, Jameson, and Budrow courts and we agree with their analyses.
In their reply brief in this court, Grodensky and the class maintain that the casino's mandatory tipping pool is like a service charge imposed on dealers. (See Searle v. Wyndham Internat., Inc., supra, 102 Cal.App.4th 1332.) A mandatory service charge is a set amount that an employer requires the customers to pay. Grodensky and the class assert that a service charge imposed on customers is legal (see ibid.), but one imposed on the employees is unlawful. We disagree that the mandatory tipping pool is equivalent to a mandatory service charge. The casino requires the dealers to pay between $3 and $5 per hour from their tip money; this money was not deducted from their wages. Further, except for the money that went to the shift managers, which we have already concluded was an unlawful practice, the money did not go to the casino. Accordingly, we reject the attempt by Grodensky and the class to rename "tip pool" as a service charge in an attempt to distinguish the facts of this case from other cases.
Finally, Grodensky and the class contend that, even if we conclude that the tipping pool was lawful, the tipping pool used by Artichoke Joe's was unlawful because only the dealers contributed to it and the fixed point system was unfair. They claim that the trial court found that other employees also received tips from the patrons, but the casino did not require them to *1449 contribute any portion of their tips to the tipping pool. They claim that, for the Leighton analysis to apply, all tip recipients must pool their tips. Further, they maintain that the casino's fixed point system was not based on a percentage of the tips received, as it was in Leighton and, consequently, the dealers suffered the entire risk of bad tipping.
The problem with this latter argument is that Labor Code section 351 does not address these equitable considerations raised by Grodensky and the class. Rather, the statute's clear intent is to prevent the public from being defrauded, which could happen if employers or their agents use any portion of the gratuities left for employees for their own benefit. It is not this court's role to add language to statutes and to create duties or obligations that are not set forth in the statute. Thus, even if Artichoke Joe's distribution of the gratuities among the various employees was not equitable, such an action did not violate Labor Code section 351.
Accordingly, we conclude that Artichoke Joe's policy of requiring a tipping pool for the dealers did not violate Labor Code section 351.[10]

B. The Trial Court's Finding That the Casino Did Not Violate the Minimum Wage Law

The trial court found that Grodensky and the class failed to establish by a preponderance of the evidence that Artichoke Joe's violated the minimum wage laws under Labor Code section 1194. Grodensky and the class challenge this finding and assert that the casino failed to comply with the minimum wage laws.
The question whether the evidence supported a finding that Artichoke Joe's did not violate Labor Code section 1194, subdivision (a) is reviewed to determine whether substantial evidence supported this finding. "`When a finding of fact is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court begins and ends with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the finding of fact. [Citations.] [ถ] When two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court.' [Citation.]" (Scott v. Common Council (1996) 44 Cal.App.4th 684, 689 [52 Cal.Rptr.2d 161], quoting Green Trees Enterprises, Inc. v. Palm Springs Alpine Estates, Inc. (1967) 66 Cal.2d 782, 784-785 [59 Cal.Rptr. 141, 427 P.2d 805].)
*1450 Labor Code section 1194, subdivision (a) provides: "Notwithstanding any agreement to work for a lesser wage, any employee receiving less than the legal minimum wage or the legal overtime compensation applicable to the employee is entitled to recover in a civil action the unpaid balance of the full amount of this minimum wage or overtime compensation, including interest thereon, reasonable attorney's fees, and costs of suit."
The trial court found that it was undisputed that every dealer was paid and received a weekly paycheck for the minimum hourly wage regardless of tips and every dealer contributed daily to the tip pool from chips received as tips. Thus, none of the money from the tip pool came from the dealers' wages and the wages were not below minimum wage. The court observed that all of the dealers received "income from their job significantly in excess of minimum wage, whether on a weekly, monthly, or yearly basis." Further, the dealers presented no evidence that the tips collected for the pool were used to offset the wages owed.
Thus, here, the record establishes that the casino did not credit tips against or deduct tips from wages it owed the dealers. Moreover, the casino did not pay any of the dealers a salary below minimum wage.
In their briefs in this court, Grodensky and the class cite cases that establish that employees must be paid minimum wage irrespective of any additional tip money they make and they argue that the casino is not really paying the minimum wage because, for each hour it pays, it had previously removed $3 to $5. Grodensky and the class then present a hypothetical. Notably absent from their discussion is any citation to the evidence in the record. Thus, they have clearly not met their burden of establishing that substantial evidence does not support the lower court's ruling. In any event, their argument is not persuasive. The dealers indisputably received a check for the minimum wage and no money was taken from their paychecks to pay the tip pool. The money taken from the gratuities to pay into the tip pool was not used by the casino to pay the dealers' salaries; it was used to pay other employees' tips.
Grodensky and the class argue that when the casino took control of the dealers' tips, it effectively reduced the wages it pays to the employees and they cite, with almost no analysis, Cal. Drive-in Restaurant Assn. v. Clark (1943) 22 Cal.2d 287, 293 [140 P.2d 657].[11] In Cal. Drive-in, the employment arrangement was that the tips received by the people serving the cars constituted their wages, and the employer added any amount necessary to *1451 ensure that they received the minimum wage. (Id. at p. 290.) The Cal. Drive-in court held that permitting an employer to retain tips received by the employee below the minimum wage "would be a subterfuge for him to receive all the tips and pay the minimum wage. The end result would be counting the tips as a part of the legal wage." (Id. at p. 293.) The court proceeded to state that the prohibition against the employer's retaining any portion of the tips "should be strictly limited, and [the statute at that time] would not be violated in instances where the employer retained the entire amount of all tips received above the minimum wage, or deducted the tips from the amount of any wages he agreed to pay in excess of the specified minimum." (Ibid.)
Thus, the foregoing case provides no support for Grodensky and the class. In the present case, the evidence presented at trial was that no dealer received a regular paycheck, excluding their tips, that was below the minimum wage and no amount of the amount garnered for the tip pool was taken from the regular paycheck.
Grodensky and the class also cite to a California Attorney General opinion in support of their position. (See 3 Ops.Cal.Atty.Gen. 178 (1944).) The Attorney General opined that it would be a violation of an order to require a waitress as a condition of employment "to return 25 [cents] per day, or any amount of the minimum wage paid her for this or any purpose, unless it is a deduction required by law." (Ibid.) Obviously, an Attorney General opinion from 1944 has limited relevance, but it is clear in this opinion that the Attorney General was concerned that the employer not be able to require any kind of tip sharing that would reduce the waitress's wage below minimum wage. As already stressed, Grodensky and the class have pointed to no evidence in the record that indicates that the casino pays them less than minimum wage and that any of the money used for the tip pool reduced their wages below the minimum wage requirement.[12]
We conclude that the record supported the lower court's finding that the casino paid Grodensky and the dealers at least the minimum wage and the money required to be placed in the tip pool was not from the regular paycheck but exclusively from the amount collected in tips. Further, the evidence established that the casino did not use any of the tip money to pay the regular salary of the dealers. Accordingly, we affirm the lower court's finding that the casino did not violate Labor Code section 1194, subdivision (a).

*1452 C. The Trial Court's Finding That Floor Managers Are Not Agents

A tipping pool is permissible under Labor Code section 351 as long as the tips are shared with employees and not taken by the employer or its agent. Here, the trial court found that the dealers' tips could be shared with the floor managers as it ruled that they were not agents under Labor Code section 350, subdivision (d). Grodensky and the class challenge this finding.
Labor Code section 350 defines the words "employer" and "agent" as they are used in Labor Code section 351. "`Agent' means every person other than the employer having the authority to hire or discharge any employee or supervise, direct, or control the acts of employees." (Lab. Code, ง 350, subd. (d).) "`Employee' means every person, including aliens and minors, rendering actual service in any business for an employer, whether gratuitously or for wages or pay, whether the wages or pay are measured by the standard of time, piece, task, commission, or other method of calculation, and whether the service is rendered on a commission, concessionaire, or other basis." (Lab. Code, ง 350, subd. (b).)
Grodensky and the class argue that we should reverse as a matter of law because the lower court interpreted the statute to require that Grodensky and the class show that the floor manager had "substantive" authority to hire or discharge any employees or supervise, direct, or control the acts of employees. They complain that the trial court used a more stringent standard than the one set forth in the statute. The trial court stated that it interpreted the statute to mean that the "supervision, direction, and/or control [must be] of a substantive nature." It proceeded to explain, "If a dealer asks the janitor to clean up a spill at the table, that does not make the dealer a person who `directs or controls' the acts of the janitor." Thus, the court was merely clarifying that occasionally directing someone to do something would not make a person an agent under the statute. We do not agree with Grodensky and the class that the lower court created a higher standard for supervision; the trial court was simply explaining that there had to be a regular rather than an occasional exercise of authority. Accordingly, we review the record to determine whether substantial evidence supported the trial court's ruling. (See our discussion of this standard of review, pt. II.B., ante.)
Here, the trial court pointed out that the job title of manager did not prove that the floor manager had actual supervisory powers over the dealers. It also noted that the manual indicated that floor managers supervised the dealers, but it correctly concluded that this was not dispositive of the issue. The undisputed evidence in the record was that floor managers did not have the authority to hire or fire any employee. Floor managers also did not schedule the dealers' shift assignments or approve vacation or medical leave. They *1453 also had no role in the setting of wages or benefits or work hours of employees. They also did not handle matters such as dealers' being late or absent.
The trial court found that the "key responsibility" of a floor manager was to resolve disputes at the game tables between customers or disputes between a dealer and a customer. The dealer was never supposed to get into arguments with the customers, but was just supposed to deal the cards. The court summarized the floor managers' duties as "to start games, greet customers, see that games run smoothly, change cards for games, prevent cheating, mak[e] rulings on misdeals or disputes, and protect dealers from abuse of patrons (by getting rid of troublemakers)."
Grodensky and the class contend that Bachman conceded that floor managers were the immediate supervisors of the dealers. Bachman testified that the floor managers had the authority to handle disputes between the dealers and customers. Bachman stated that the floor manager could tell dealers that they had to deal with a player who was being obnoxious at the table. Also, the floor manager could tell the dealer who should receive the "pot" when a dispute as to the winner of a hand arose. Further, a floor manager could complete a form that indicated a concern about a dealer's performance. Bachman stated that he relied "in part" on these evaluations on the forms when determining whether dealers were following the rules.
The court considered the foregoing evidence, but noted that all written notices of cardroom violations had to be countersigned by Bachman or Willson. Bachman investigated the violations. Further, the evidence indicated that the floor managers did not regularly draft written notices of violations. Since the evidence showed that these notices had no effect without the signing of Bachman or Willson, the record supported a finding that the floor managers did not have the authority to discipline the dealers.
We conclude that the record supported the lower court's findings that a floor manager was not an agent. Although there was some evidence that the floor managers had some authority over the dealers, the record established that the floor managers' principal responsibility was to ensure the games ran smoothly. The undisputed evidence was that they did not have the authority to hire or discharge dealers and the evidence supported a finding that they did not supervise, direct, or control the acts of the dealers.

D. The Trial Court's Dismissal of the Conversion Claim

The trial court dismissed the claim of conversion by Grodensky and the class. The court found that there was nothing unwarranted or wrongful in *1454 requiring the dealers to share their tips, and therefore Grodensky and the class did not establish all of the elements of conversion. The court stated that the only wrongful conduct alleged for purposes of the conversion claim arose from the violation of Labor Code section 351, and the court declared that Grodensky and the class were limited to statutory remedies. The court stated that it would not permit the statutory claim to "metamorphosize [sic] into a tort claim seeking punitive damages."
In their pleading, Grodensky and the class based their claim of conversion on the alleged violation of Labor Code section 351.[13] In their briefs in this court challenging the dismissal of this claim, they set forth the elements of conversion[14] and assert that they presented evidence to support each element. Grodensky and the class, however, do not address the basis for the court's ruling that Grodensky and the class are limited to the statutory remedy set forth by the Legislature.
(26) "As a general rule, where a statute creates a right that did not exist at common law and provides a comprehensive and detailed remedial scheme for its enforcement, the statutory remedy is exclusive. [Citations.] But where a statutory remedy is provided for a preexisting common law right, the newer remedy is generally considered to be cumulative, and the older remedy may be pursued at the plaintiff's election." (Rojo v. Kliger (1990) 52 Cal.3d 65, 79 [276 Cal.Rptr. 130, 801 P.2d 373].) As the issue presented is entirely legal in nature, we employ our independent judgment. (Gatto v. County of Sonoma (2002) 98 Cal.App.4th 744, 753 [120 Cal.Rptr.2d 550].)
While we are not aware of any California cases on point, federal courts have held that the Labor Code provides a comprehensive and detailed remedial scheme that provides an exclusive statutory remedy. (See Thomas v. Home Depot USA Inc. (N.D.Cal. 2007) 527 F.Supp.2d 1003 [claim for conversion of wages owed for working through rest and meal periods based *1455 on violation of Lab. Code was improper because Lab. Code provided exclusive remedy]; In re Wal-Mart Stores, Inc. Wage and Hour Lit. (N.D.Cal. 2007) 505 F.Supp.2d 609, 618-619 [claim for conversion based on violations of Lab. Code improper]; Pulido v. Coca-Cola Enterprises, Inc. (C.D.Cal., May 25, 2006, No. EDCV06-406VAP (OPX)) 2006 WL 1699328 at p. *9 [no claim for conversion when claim based on violation of Lab. Code, ง 226.7]; Green v. Party City Corp. (C.D. Cal., Apr. 9, 2002, No. CV-01-09681) 2002 WL 553219 at p. *4 [no claim for conversion when claim based on alleged statutory violation of the Lab. Code for overtime pay].) Thus, the federal courts have consistently rejected any tort claims based on a violation of the Labor Code.
(27) We agree that a claim for conversion based on an alleged violation of Labor Code section 351 is improper. Gratuities were not even considered the employees' property until Labor Code section 351 was amended in 1973. (See Henning, supra, 46 Cal.3d at p. 1273.) Thus, an employee did not have a common law right to his or her gratuity. "`"`Where a new right is created by statute, the party aggrieved by its violation is confined to the statutory remedy....'"'" (Stevenson v. Superior Court (1997) 16 Cal.4th 880, 900 [66 Cal.Rptr.2d 888, 941 P.2d 1157].) Since Labor Code section 351 created a right and did not simply provide a new remedy for a preexisting right, Grodensky and the class cannot base their tort claim for conversion on a violation of Labor Code section 351.

E. Alleged Violations of Labor Code Sections 221 and 450, Subdivision (a) As a Basis for a UCL Claim

The trial court ruled that the mandatory tip pool program did not violate Labor Code sections 221 and 450, subdivision (a). It therefore rejected any contention that any alleged violation of these statutes could be grounds for the UCL claims.
On appeal, Grodensky contends the record supported a finding that the casino violated Labor Code sections 221 and 450, subdivision (a). We review whether the record supported a finding of no violation of these statutes under the substantial evidence test. To the extent that we must interpret the statutes, we review the lower court's finding de novo.

1. Labor Code Section 221

Labor Code section 221 provides, "It shall be unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee." Labor Code section 200, subdivision (a) reads, "`Wages' includes all amounts for labor performed by employees of *1456 every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation." Labor Code section 350, subdivision (e) defines gratuity as follows: "`Gratuity' includes any tip, gratuity, money, or part thereof that has been paid or given to or left for an employee by a patron of a business over and above the actual amount due the business for services rendered or for goods, food, drink, or articles sold or served to the patron. . . ."
(28) Under this statute, wages do not include tips or gratuities because tips are not owed by the employer. As discussed earlier, the record supported the lower court's finding that the casino paid the dealers the wages owed and no part of the dealers' wages was used for the tipping pool. The casino therefore did not collect or receive any part of the dealers' wages, and the trial court properly found no violation of Labor Code section 221.

2. Labor Code Section 450, Subdivision (a)

(29) Labor Code section 450, subdivision (a) states: "No employer, or agent or officer thereof, or other person, may compel or coerce any employee, or applicant for employment, to patronize his or her employer, or any other person, in the purchase of any thing of value." The intent of the Legislature when enacting Labor Code section 450 was to protect wage earners against coercion to purchase products or services from the employer. (California State Restaurant Assn. v. Whitlow (1976) 58 Cal.App.3d 340, 347 [129 Cal.Rptr. 824].)
Grodensky argues that the dealers were forced to purchase their jobs with their tips. He, however, ignores the legislative intent for enacting Labor Code section 450, subdivision (a), which was to prevent an employer from compelling an employee to purchase products or services. The statute bars an employer from compelling an employee to "patronize his or her employer, or any other person, in the purchase of any thing of value." (Lab. Code, ง 450, subd. (a).) Here, the dealers were not forced to purchase any products or services. Further, tips belong to the employees serving the customers, and therefore mandatory tip sharing among employees is legal. (Leighton, supra, 219 Cal.App.3d at pp. 1069, 1071 [a tip pool "protects the personal property of the employees and ensures a fair distribution of the gratuity to those who earned it, making certain that each gets his fair share"].) The tips are the property of the casino employees, not simply the dealers. Thus, the dealers have not had to pay to other employees any of the money that belongs solely to them. To the extent that the sharing of the tips among the agents of the casino violated any statute, the trial court found, and we have affirmed, that this practice violated the law and was the proper basis for a UCL claim.

*1457 DISPOSITION
That portion of the judgment regarding the award of attorney fees to Grodensky is reversed and remanded for proceedings consistent with this opinion. The judgment is otherwise affirmed. No costs are awarded.
Kline, P. J., and Richman, J., concurred.
NOTES
[1] The complaint alleged that Sammut was an agent of the casino.
[2] The record does not include an order regarding the amount of attorney fees awarded. When contacted by the clerk of this court about receiving a copy of an order on attorney fees, counsel for the casino responded that the lower court was waiting until the issues on appeal had been settled before ruling on the amount of attorney fees.
[3] The number of class members, including Grodensky, was 78.
[4] See also Code of Civil Procedure section 22, which reads: "An action is an ordinary proceeding in a court of justice by which one party prosecutes another for the declaration, enforcement, or protection of a right, the redress or prevention of a wrong, or the punishment of a public offense." We also note the maxim contained in Civil Code section 3523: "For every wrong there is a remedy."
[5] The statute of limitations on an action to recover unpaid wages under the Labor Code is three years under Code of Civil Procedure section 338. (See, e.g., Murphy v. Kenneth Cole Productions, supra, 40 Cal.4th at pp. 1108-1109; Cortez, supra, 23 Cal.4th at p. 168.) However, the statute of limitations under the UCL is four years. (Bus. & Prof. Code, ง 17208.) Business and Professions Code section 17208 provides: "Any action to enforce any cause of action pursuant to this chapter shall be commenced within four years after the cause of action accrued. No cause of action barred under existing law on the effective date of this section shall be revived by its enactment."

The four-year statute of limitations applies to Grodensky's UCL claim. The court in Cortez explained: Business and Professions Code "[s]ection 17208 is clear. . . . We recognize that any business act or practice that violates the Labor Code through failure to pay wages is, by definition . . ., an unfair business practice. It follows that an action to recover wages that might be barred if brought pursuant to Labor Code section 1194 still may be pursued as a UCL action seeking restitution pursuant to [Business and Professions Code] section 17203 if the failure to pay constitutes a business practice. Nonetheless, the language of section 17208 admits of no exceptions. [Italics added.] Any action on any UCL cause of action is subject to the four-year period of limitations created by that section. [Original italics.]" (Cortez, supra, at pp. 178-179, citation omitted.)
[6] In its opening brief, the casino provided no citation to the record to support the claim that the lawsuit was valued at over $9 million. In its reply brief, it cites to papers it filed in the trial court where it asserted that the tip pool was worth $4,283,553, liquidated damages were worth the same amount, and its estimate of its own attorney fees was $800,000.
[7] As already noted, Labor Code section 351 reads: "No employer or agent shall collect, take, or receive any gratuity or a part thereof that is paid, given to, or left for an employee by a patron, or deduct any amount from wages due an employee on account of a gratuity, or require an employee to credit the amount, or any part thereof, of a gratuity against and as a part of the wages due the employee from the employer. Every gratuity is hereby declared to be the sole property of the employee or employees to whom it was paid, given, or left for. . . ."
[8] The trial court found the following: "Tips are given to dealers by patrons directly. Almost always the tipper is the player with the winning hand. A tip is then given to the dealer by either a soft toss, or pushing the chip towards the dealer, or handing the chip to the dealer. It is the policy of Artichoke Joe's that when a dealer is given a tip by a player, the dealer must acknowledge the tip, take the chip(s), put the tip in his/her pocket, and verbally say `Thank you' to the patron." (Fn. omitted.) The court noted that Grodensky and the class submitted evidence of polls taken of patrons at Artichoke Joe's, which showed that "a significant, although minority, percentage of such customers were `surprised' and/or did not know or understand[] that tips given to dealers would be shared with other employees . . . ." The fact that some customers may not have known that tips were shared does not indicate that none of the other employees contributed to the customers' having a pleasant experience at the casino.
[9] The casino asserts that it had a longtime policy of a tipping pool. Indeed, the trial court found that "[t]he overwhelming evidence demonstrates that tip sharing by dealers with floor managers, shift managers, and other employees of the card room was commonplace, long-standing, and consistent with industry practices for decades." Grodensky and the class counter that there has been a history of tipping out, not of a tipping pool. They assert that tipping out is not the same as a tipping pool because the dealers have control over what to do with their tips when there is tipping out. We need not consider the differences between a tipping pool and tipping out because our holding does not require that the commercial establishment have a history of a tipping pool. Again, the reason the Leighton court pointed out the history of tipping pools was to note that the Legislature must have been aware that they existed and could have prohibited them by amending the statute if that was the Legislature's intent.
[10] Since we conclude that the express language of the statute and the holdings of court opinions compel this holding, we need not consider the casino's argument that the Department of Labor Standards Enforcement has supported the holdings of Leighton and Jameson in a 1998 opinion letter and in a 2005 opinion letter.
[11] Cal. Drive-in Restaurant Assn. v. Clark was decided when it was lawful for an employer to take employees' tips.
[12] The trial court would not permit specific evidence of the income for individual dealers, finding that concerns over their privacy rights trumped any probative value of this evidence. Grodensky testified that he made between $100 and $250 per day in tips, and he believed that his tips fell into the middle range as compared to other dealers. He also stated that his contribution to the tip pool was $34 per eight-hour shift. The casino cardroom manager, Bachman, testified that casino dealers earned between $150 and $800 per day in income.
[13] Specifically, Grodensky and the class alleged in their cause of action for conversion the following in pertinent part: "Labor Code section 351 provides that gratuities are the sole property of the employee, to whom they are paid or given. By the conduct alleged herein, defendants wrongfully exercised dominion over a portion of the gratuities of the class members. As a result, plaintiff and the class members have been denied the possession, use and enjoyment of their gratuities and have been otherwise damaged in an amount to be proved at trial."
[14] The elements of conversion "`are the plaintiff's ownership or right to possession of the property at the time of the conversion; the defendant's conversion by a wrongful act or disposition of property rights; and damages. It is not necessary that there be a manual taking of the property; it is only necessary to show an assumption of control or ownership over the property, or that the alleged converter has applied the property to his own use. [Citations.]' [Citation.] Money can be the subject of an action for conversion if a specific sum capable of identification is involved." (Farmers Ins. Exchange v. Zerin (1997) 53 Cal.App.4th 445, 451-452 [61 Cal.Rptr.2d 707].)